PEOPLE v TURNER

OPINION OF THE COURT

1. CRIMINAL LAW—ENTRAPMENT.

The basis of the entrapment defense is that the methods used by
the police are repugnant to fair play and justice; in an attempt
to discourage these practices and uphold public confidence in
the fair and honorable administration of justice, courts refuse
to allow convictions based on entrapment.

2. CRIMINAL LAW—ENTRAPMENT—OBJECTIVE TEST.

The objective test of entrapment, that where the defendant has
proved entrapment it is not permissible for the government to
show in rebuttal that the officer guilty of incitement of the
crime had reasonable cause to believe the defendant was a
person disposed to commit the offense, is the only one truly
consistent with the underlying rationale of the defense; the
very basis of the entrapment defense itself demands adherence
to an approach that focuses on the conduct of the governmental
agents, rather than on whether the defendant was "predis-
posed" or "otherwise innocent".

3. CRIMINAL LAW—ENTRAPMENT—SUBJECTIVE TEST—PUBLIC POLICY.

The use of the subjective test of entrapment, that the Court must
look at (1) the conduct of the police, and (2) the predisposition
of the defendant, fails to focus on the real concern in these
cases—whether the actions of the police were so reprehensible
under the circumstances, that the Court should refuse, as a
matter of public policy, to permit a conviction to stand.

4. CRIMINAL LAW—ENTRAPMENT—OBJECTIVE TEST.

The Michigan Supreme Court should adopt an objective test of

REFERENCES FOR POINTS IN HEADNOTES

[1–4, 7] 21 Am Jur 2d, Criminal Law §§ 143–145.

[5, 6, 8, 12] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 16, 17.

[9] 21 Am Jur 2d, Criminal Law § 145; 25 Am Jur 2d, Drugs,
Narcotics and Poisons §§ 16, 17.

[10, 11] 25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 4, 7, 9, 16.

[13, 14] 21 Am Jur 2d, Criminal Law § 143.

entrapment that where the defendant has proved entrapment it is not permissible for the government to show in rebuttal that the officer guilty of incitement of the crime had reasonable cause to believe the defendant was a person disposed to commit the offense, because, where a person contemplating the commission of an offense approaches an officer of the law and asks his assistance, it is the duty of the officer to decline to render such assistance and to take such steps as would be likely to prevent the commission of the offense, the mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse much less a justification for the officers encouraging or assisting parties to commit crime in order that they may arrest and have them punished for so doing, and entrapment has occurred when government agents' involvement in criminal activities goes beyond the mere offering of an opportunity to commit an offense and the agents' conduct is of a kind that could induce or instigate the commission of a crime by one not ready and willing to commit it regardless of the character or propensities of the particular person induced.

5. CRIMINAL LAW—ENTRAPMENT—HEROIN—POSSESSION.

Defendant was entrapped into the possession of heroin as a matter of law where the investigation of defendant was precipitated by the actions of an undercover agent, the only thing that defendant had done was to become a friend of the undercover agent and giving him some pep pills and caffeine pills on a few occasions, where the undercover agent invented a story of an addict girl friend to play on defendant's sympathy as a friend and defendant, after telling the agent that heroin was bad, obtained heroin for the agent on one, and only one, occasion, and where the trial judge determined the defendant was not a dealer in drugs.

FOR REVERSAL

WILLIAMS, J.

6. DRUGS AND NARCOTICS—HEROIN—POSSESSION—ENTRAPMENT.

*Conviction for possession of heroin should be reversed where the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials.*

7. CRIMINAL LAW—WORDS AND PHRASES—PERSON OTHERWISE INNOCENT—ENTRAPMENT—CREATIVE ACTIVITY—PRIOR RECORD.

*The phrase "person otherwise innocent" in the standard set by*

the United States Supreme Court referring to a defendant whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials should be construed more narrowly to refer to a person otherwise innocent of the specific type of crime charged; this would mean that police would have to prove, if properly challenged, that the defendant either had a prior record of crimes of the specific nature charged, or some other matter destroying the concept that the defendant was a person otherwise innocent of this type of crime.

DISSENTING OPINION

T. E. BRENNAN, J.

8. DRUGS AND NARCOTICS—HEROIN—POSSESSION—PRINCIPAL AND AGENT—STATUTES.

There is nothing in the nature of the agency relationship which negates the possibility of possession by the agent within the meaning of the statute prohibiting possession of heroin; the word possession is used in the statute in its commonly understood sense (MCLA 335.153).

9. DRUGS AND NARCOTICS—CONTRABAND—HEROIN—POSSESSION.

Rule that fleeting, momentary contact with a contraband substance does not constitute unlawful possession should not be extended to a case in which the possession of the prohibited substance, heroin, is not merely incidental to its use or consumption (MCLA 335.153).

10. CRIMINAL LAW—ENTRAPMENT—CREATIVE ACTIVITY TEST—CONTRABAND—UNLAWFUL SALE.

The notion that a crime is the product of entrapment, where the idea for the commission of the crime is germinated in the mind of the officer—the so-called creative activity test—is peculiarly inapplicable in a prosecution for unlawful sale of contraband, as to rule otherwise would be to hold that government may only proscribe the offering and not the sale and each case would turn upon the question of whether the illegal bargain began with an offer to sell or an offer to buy.

11. CRIMINAL LAW—CONTRABAND—UNLAWFUL SALE—ENTRAPMENT—MISREPRESENTATIONS—CONNIVANCE—TRICKERY—SUBTERFUGE.

Inducement, encouragement, or invitation to the making of an unlawful sale of contraband does not constitute entrapment, even where misrepresentations, connivance, trickery, or subterfuge have been used to gain the confidence of the seller.

12. DRUGS AND NARCOTICS—HEROIN—POSSESSION.

*Conviction of the unlawful possession of heroin should be affirmed where the trial judge could have concluded beyond reasonable doubt that defendant was in the sole and exclusive possession of the heroin for a period of several hours during which time he alone transported it from one city to another (MCLA 335.153).*

DISSENTING OPINION

M. S. COLEMAN, J.

13. CRIMINAL LAW—DECEIT—ENTRAPMENT.

*The fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution, nor will the mere fact of deceit defeat a prosecution for there are circumstances when the use of deceit is the only practicable law enforcement technique available; it is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.*

14. CRIMINAL LAW—ENTRAPMENT—DRUGS AND NARCOTICS—HEROIN—POLICE OFFICERS.

*Procedure used by a police officer is a recognized and permissible means of apprehension, the tactics do not violate long established legal standards and defendant was not entrapped in the possession of heroin where the officer was investigating the possession and sale of narcotics, another man to whom defendant had sold some prescription pills became acquainted with the officer and introduced him to defendant, the other man told defendant that he had a girl friend who was a heroin addict, who was having problems supplying her habit and he purchased heroin from defendant.*

Appeal from Court of Appeals, Division 2, Lesinski, C. J., and McGregor and Quinn, JJ., reversing in part and affirming in part Lenawee, Rex B. Martin, J. Submitted March 8, 1973. (No. 11 March Term 1973, Docket No. 53,996.) Decided September 18, 1973.

38 Mich App 479 reversed.

Thomas P. Turner was convicted of the sale and

possession of heroin. Defendant appealed to the Court of Appeals. Reversed as to conviction of sale and affirmed as to conviction of possession. Defendant appeals. Reversed and defendant discharged.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Harvey A. Koselka,* Prosecuting Attorney *(Thomas R. Lewis* and *James D. Hunter,* of counsel), for the people.

*State Appellate Defender Office* (by *David A. Goldstein),* for defendant on appeal.

SWAINSON, J. Defendant Thomas Patterson Turner was bench tried and convicted of the sale[1] and possession[2] of heroin. He was sentenced to 20 to 30 years in prison for the sale of heroin and 4 to 10 years in prison for the possession of heroin. The Court of Appeals reversed his conviction on the count of sale and affirmed as to the count of possession. 38 Mich App 479; 196 NW2d 799. We granted leave to appeal. 387 Mich 776.

Defendant contends on appeal that he was entrapped into the possession of the heroin. In order to determine the validity of this assertion, we must look closely at the facts of this case. In 1967, Thomas Patterson Turner was introduced to undercover agent Melbourne Owen Partridge. At this time, Mr. Turner was employed at the Ford Motor Company, and also was an antique dealer. With the exception of one arrest as a juvenile, Mr. Turner did not have a criminal record. Mr. Partridge was a part-time sheriff's deputy and a truck driver employed by the Tecumseh Corrugated Box Company. Approximately six months after their initial introduction, Partridge complained to

---

[1] MCLA 335.152; MSA 18.1122.

[2] MCLA 335.153; MSA 18.1123.

Turner of drowsiness while driving on long trips. Turner sold him some pills to help him stay awake. Partridge turned these pills, which he believed were narcotics, over to the county sheriff who apparently did not act on this information. More pills were obtained approximately four months later and Partridge flushed them down his toilet.

Partridge testified that Turner visited with him on a regular basis, averaging about once a month over a period of three years. Partridge believed that Turner considered him a friend but he testified that he did not consider Turner a friend. Partridge obtained pills about a dozen times over a period of two years. He swallowed them on two occasions and destroyed them the other times. Partridge testified that he considered filing a criminal complaint against defendant but failed to do so.

.Partridge discussed the matter of Turner's actions with a Tecumseh police officer, Officer Don Rodehaver in the fall of 1969. Officer Rodehaver introduced Partridge to Trooper James Ewers. Partridge informed the trooper that he believed that Turner was selling narcotics and Partridge and Ewers planned to find out if Turner was dealing in narcotics and make a purchase from Turner if at all possible.

Partridge introduced Ewers to Turner as a co-truck driver. Ewers and Partridge visited Turner at least six times in the fall of 1969 and bought stag movies and pills. Partridge testified that one purpose in going to defendant's house was to see if he could get any information on dope and buy dope if possible. On one occasion that the pills were tested, they were found to contain caffeine. The agents were unable to buy either narcotics or

drugs from Turner and the case was closed prior to December, 1969.

In February, 1970, Ewers told Partridge that he wanted to investigate Mr. Turner further. He asked for Partridge's help and a new investigation was commenced. At the time, Turner had quit his job of 21 years at the Ford Motor Company in order to devote himself full time to the antique business. In order to gain Turner's confidence, Ewers feigned interest in the antiques and potential purchases from Turner. Partridge also inferred that he would haul some antiques for Turner from Pennsylvania to Michigan thus saving Turner the freight charges. He testified that he wanted to convey to Turner the impression that he would haul back the antiques. Turner testified that on one occasion Partridge had brought a girl friend to the shop who had purchased some antiques from Turner.

Before February 22, 1970, Partridge had requested narcotics from Turner on at least one and probably several other occasions. Turner testified that when Partridge had asked him for narcotics he informed him that he didn't know anything about them and didn't want anything to do with them. On February 22, 1970, Ewers and Partridge visited Turner. Turner asked them if they wanted some pills and Partridge said yes and also asked him for some hard stuff. Partridge testified that Turner informed him of the harmful effects of heroin and that it was a bad idea to use either marijuana or heroin. Partridge told him that it was for his girl friend in Monroe County who was an addict and very good looking and who would quit dating him if he didn't find some heroin for her. In fact, no such person existed and Partridge testified that he invented the story about the

addict girl friend so Turner would believe it. Turner agreed to help out his friend who he believed was "in a little of a spot" and to obtain some heroin from a friend of his in Detroit who had become addicted to heroin.

The next morning Partridge gave Turner $20 with which to make the purchase. Early in the morning of February 24, 1970, Turner brought Partridge the requested pills, marijuana and heroin. He asked Partridge for an additional $17 since the heroin alone had cost $20.

Ewers had arrived at Partridge's house earlier to set up two tape recorders which recorded the ensuing conversations. He was present during the entire transaction. After Turner had left, Ewers and Partridge took the tape recorders and drove them to the state police post in Clinton. Turner was not arrested, apparently because the police were interested in his source of supply of the heroin.

Ewers and Partridge subsequently tried to obtain more heroin by using the girl friend story. Turner did not have any heroin and was unwilling to obtain any, but he did agree to introduce them to a Mr. Cope in Detroit from whom he had obtained the heroin that he had given to Partridge.

On March 3, 1970, Turner drove Ewers and Partridge to Detroit where they purchased heroin from Cope. Ewers wore a concealed transmitter which relayed the conversations during the trip to the Detroit police.

On March 11, 1970, Turner was arrested and charged with sale and possession of heroin. Ewers, on this date, interrogated Turner and asked him to become an informer. He told Turner that if he cooperated, the prosecution would be notified.

On April 7, 1970, a preliminary examination was held in Adrian, Michigan. The court denied a defense motion to release Turner on the ground that he was entrapped as a matter of law. Turner was bench tried in late June and early July of 1970. The trial court denied defense counsel's motion to quash the information on' the grounds of entrapment and misstatements of the examining magistrate. The trial court also denied a defense motion to sequester Ewers during Partridge's testimony or alternatively to reverse the order in which the two witnesses testified. Partridge was permitted to testify first while Ewers was present in the courtroom.

The defense of entrapment, now accepted throughout the United States, appears to have originated in an early Michigan case, *Saunders v People,* 38 Mich 218 (1878).[3] In *People v Sinclair,* 387 Mich 91, 116–120; 194 NW2d 878 (1972), I discussed the defense of entrapment and the split of authority over whether an objective or subjective test should apply. In this time of growing concern over the illegal and immoral use of the power of the government to gain convictions, the warnings of our Supreme Court almost a century ago should not be forgotten. As was stated in the *Sinclair* case, *supra,* 116–120:

"Our Court has long recognized the defense of entrapment and the public policy behind this rule. In *Saunders v People,* 38 Mich 218 (1878), the Court reversed Saunders' conviction for breaking and entering by night a court room not connected with a dwelling and 'taking therefrom certain recognizances described as contracts in force and public records'. The Court held:

" 'Decoying, or conniving with persons suspected of

[3] DeFeo, *Entrapment as a Defense to Criminal Responsibility: Its History, Theory and Application.* 1 U San Fran L Rev 243, 248 (1967).

criminal designs, for the purpose of arresting them in the commission of the offense, is denounced by the Supreme Court.' (Syl 1.)

"Justice COOLEY, writing for the Court, reversed on the grounds that the testimony of a witness named Dunnebacke, should not have been excluded. Two of the Justices held that the conviction should be reversed because of impermissible police conduct. Justice MAR-STON stated (pp 221–222):

" 'I cannot, however, silently permit the extraordinary course adopted by the police officers in this case to pass unnoticed and uncondemned. * * *

" 'The course pursued by the officers in this case was utterly indefensible. Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his farther debasement. Some courts have gone a great way in giving encouragement to detectives, in some very questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing. The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case. If such were the fact, then the greater reason would seem to exist why he should not be actively assisted and encouraged in the commission of a new offense which could in no way tend to throw light upon his past iniquities, or aid in punishing him therefor, as the law does not contemplate or allow the conviction and punishment of parties on account of their general bad or criminal conduct, irrespective of their guilt or innocence of the particular offense charged and for which they are being tried. Human nature is frail enough at best, and requires no

encouragement in wrong-doing. If we cannot assist an-
other and prevent him from violating the laws of the
land, we at least should abstain from any active efforts
in the way of leading him into temptation. Desire to
commit crime and opportunities for the commission
thereof would seem sufficiently general and numerous,
and no special efforts would seem necessary in the way
of encouragement or assistance in that direction.'

"Chief Justice CAMPBELL stated (p 223):

" '[T]he encouragement of criminals to induce them to
commit crimes in order to get up a prosecution against
them, is scandalous and reprehensible.'

"Two theories have been advanced concerning the
issue of entrapment. The first view was articulated by
Chief Justice Hughes in *Sorrells v United States,* 287
US 435, 451; 53 S Ct 210; 77 L Ed 413 (1932), when he
stated:

" '[T]he defense of entrapment is not simply that the
particular act was committed at the instance of govern-
ment officials. That is often the case where the proper
action of these officials leads to the revelation of crimi-
nal enterprises. * * * The predisposition and criminal
design of the defendant are relevant. But the issues
raised and the evidence adduced must be pertinent to
the controlling question whether the defendant is a
person otherwise innocent whom the Government is
seeking to punish for an alleged offense which is the
product of the creative activity of its own officials. If
that is the fact, common justice requires that the ac-
cused be permitted to prove it. The Government in such
a case is in no position to object to evidence of the
activities of its representatives in relation to the ac-
cused, and if the defendant seeks acquittal by reason of
entrapment he cannot complain of an appropriate and
searching inquiry into his own conduct and predisposi-
tion as bearing upon that issue.'

"In *Sherman v United States,* 356 US 369; 78 S Ct
819; 2 L Ed 2d 848 (1958), the majority of the Court
adopted the position of Chief Justice Hughes in *Sorrells,
supra.* Thus, according to the majority view, whenever
the defense of entrapment is raised, the court must look
at 1) the conduct of the police, and 2) the predisposition

of the defendant. The second view was stated by Justice
Roberts in *Sorrells* (pp 458–459):

    " 'It has been generally held, where the defendant
has proved an entrapment, it is permissible for the
government to show in rebuttal that the officer guilty of
incitement of the crime had reasonable cause to believe
the defendant was a person disposed to commit the
offense. This procedure is approved by the opinion of
the court. The proof received in rebuttal usually
amounts to no more than that the defendant had a bad
reputation, or that he had been previously convicted. Is
the statute upon which the indictment is based to be
further construed as removing the defense of entrap-
ment from such a defendant?

    " 'Whatever may be the demerits of the defendant or
his previous infractions of law these will not justify the
instigation and creation of a new crime, as a means to
reach him and punish him for his past misdemeanors.
He has committed the crime in question, but, by suppo-
sition, only because of instigation and inducement by a
government officer. To say that such conduct by an
official of government is condoned and rendered innocu-
ous by the fact that the defendant had a bad reputation
or had previously transgressed is wholly to disregard
the reason for refusing the processes of the court to
consummate an abhorrent transaction. It is to discard
the basis of the doctrine and in effect to weigh the
equities as between the government and the defendant
when there are in truth no equities belonging to the
latter, and when the rule of action cannot rest on any
estimate of the good which may come of the conviction
of the offender by foul means. The accepted procedure,
in effect, pivots conviction in such cases, not on the
commission of the crime charged, but on the prior
reputation or some former act or acts of the defendant
not mentioned in the indictment.'

    "In *Sherman, supra,* Justice Frankfurter, writing for
four justices of the Court, adopted the views advanced
by Justice Roberts in *Sorrells, supra.*

    "The factual situation confronting us here demon-
strates the practical problems that arise when the
majority test is employed. The basis of the entrapment
defense is that the methods used by the police are

repugnant to fair play and justice. As the court stated in *United States v Chisum,* 312 F Supp 1307, 1312 (DC Cal, 1970):

" 'Entrapment is indistinguishable from other law enforcement practices which the courts have held to violate due process. Entrapment is an affront to the basic concepts of justice. Where it exists, law enforcement techniques become contrary to the established law of the land as an impairment to due process.'

"In an attempt to discourage these practices and uphold 'public confidence in the fair and honorable administration of justice' *(Sherman .v United States, supra,* p 380 [Frankfurter, J.]), courts refuse to allow convictions based on entrapment."

Since that time, again by a one vote margin, the United States Supreme Court has reaffirmed support for a subjective test of entrapment. While the opinion of the United States Supreme Court is deserving of consideration, we are not bound by its holding in this matter. *Continental Motors v Muskegon Twp,* 365 Mich 191; 112 NW2d 429 (1961); *Mack v Reo Motors, Inc,* 345 Mich 268; 76 NW2d 35 (1956). We believe that Justice Stewart's dissenting opinion in *United States v Russell,* 411 US 423, 441–445; 93 S Ct 1637; 36 L Ed 2d 366 (1973) persuasively articulates why the objective test should be adopted in Michigan.

"In my view, this objective approach to entrapment advanced by the concurring opinions in *Sorrells* and *Sherman* is the only one truly consistent with the underlying rationale of the defense. Indeed, the very basis of the entrapment defense itself demands adherence to an approach that focuses on the conduct of the governmental agents, rather than on whether the defendant was 'predisposed' or 'otherwise innocent.' I find it impossible to believe that the purpose of the defense is to effectuate some unexpressed congressional intent to exclude from its criminal statutes persons who com-

mitted a prohibited act, but would not have done so except for the Government's inducements. For, as Mr. Justice Frankfurter put it, 'the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged.' *Sherman v United States, supra,* at 379. See also *Sorrells v United States, supra,* at 456 (Roberts, J., concurring). Since, by definition, the entrapment defense cannot arise unless the defendant actually committed the proscribed act, that defendant is manifestly covered by the terms of the criminal statute involved.

"Furthermore, to say that such a defendant is 'otherwise innocent' or not 'predisposed' to commit the crime is misleading, at best. The very fact that he has committed an act that Congress has determined to be illegal demonstrates conclusively that he is not innocent of the offense. He may not have originated the precise plan or the precise details, but he was 'predisposed' in the sense that he has proved to be quite capable of committing the crime. That he was induced, provoked, or tempted to do so by government agents does not make him any more innocent or any less predisposed than he would be if he had been induced, provoked, or tempted by a private person—which, of course, would not entitle him to cry 'entrapment.' Since the only difference between these situations is the identity of the temptor, it follows that the significant focus must be on the conduct of the government agents, and not on the predisposition of the defendant.

"The purpose of the entrapment defense, then, cannot be to protect persons who are 'otherwise innocent.' Rather, it must be to prohibit unlawful governmental activity in instigating crime. * * *

"Moreover, a test that makes the entrapment defense depend on whether the defendant had the requisite predisposition permits the introduction into evidence of all kinds of hearsay, suspicion, and rumor—all of which would be inadmissible in any other context—in order to prove the defendant's predisposition. It allows the prosecution, in offering such proof, to rely on the defendant's bad reputation or past criminal activities, including even rumored activities of which the prosecution

may have insufficient evidence to obtain an indictment, and to present the agent's suspicions as to why they chose to tempt this defendant. This sort of evidence is not only unreliable, as the hearsay rule recognizes; but it is also highly prejudicial, especially if the matter is submitted to the jury, for, despite instructions to the contrary, the jury may well consider such evidence as probative not simply of the defendant's predisposition, but of his guilt of the offense with which he stands charged.

"More fundamentally, focusing on the defendant's innocence or predisposition has the direct effect of making what is permissible or impermissible police conduct depend upon the past record and propensities of the particular defendant involved. Stated another way, this subjective test means that the Government is permitted to entrap a person with a criminal record or bad reputation, and then to prosecute him for the manufactured crime, confident that his record or reputation itself will be enough to show that he was predisposed to commit the offense anyway.

\* \* \*

"In my view, a person's alleged 'predisposition' to crime should not open him to government participation in the criminal transaction that would be otherwise unlawful.

\* \* \*

"But when the agents' involvement in criminal activities goes beyond the mere offering of such an opportunity, and when their conduct is of a kind that could induce or instigate the commission of a crime by one not ready and willing to commit it, then—regardless of the character or propensities of the particular person induced—I think entrapment has occurred. For in that situation, the Government has engaged in the impermissible manufacturing of crime, and the federal courts should bar the prosecution in order to preserve the institutional integrity of the system of federal criminal justice."

This case demonstrates why an objective test is preferable to a subjective one. During the course of

the trial, Trooper Ewers was very careful to insist that defendant offered to sell narcotics to him and insisted that he had never offered to buy any. In response to a question by defendant's counsel he stated that this was because he did not want to entrap the defendant. The use of the subjective test leads to a battle of semantics at trial over who said what first—the defendant concerned about admitting any evidence of "predisposition" and the undercover agent afraid that stating the wrong phrase at the wrong time will lead to a finding of entrapment. It fails to focus on the real concern in these cases—whether the actions of the police were so reprehensible under the circumstances, that the Court should refuse, as a matter of public policy, to permit a conviction to stand.

We agree with the position of Justices Roberts, Frankfurter, and Stewart of the United States Supreme Court and the view articulated by Justices MARSTON and CAMPBELL of our Supreme Court and adopt an objective test of entrapment in Michigan.

In this case, we hold that defendant was entrapped as a matter of law. The investigation of Turner was precipitated by the actions of undercover agent Partridge. Partridge cooperated in an investigation of a man who he had known for three years. The only thing that Turner had done over this period was to become a friend of Partridge and after discovering that Partridge felt drowsy on cross-country trips, gave him some pep pills on a few occasions. The investigation was undertaken during the fall of 1969 and the only items that were obtained after three months were caffeine pills. Caffeine pills are not illegal under Michigan or Federal law. The investigation then was closed. It was reopened a couple of months

later, not based on any new information, but at the insistence of Trooper Ewers. Ewers then feigned interest in Turner's antique business and Partridge inferred that he would bring back by truck a load of antiques for Turner, which would save Turner considerable expense in freight charges. Finally, to insure success, Partridge invented the story of an addict girl friend to play on Turner's sympathy as a friend. Partridge admits that Turner told him that heroin was bad. Finally, Turner helped out a friend and obtained heroin for Partridge on one, and only one, occasion. The trial judge, after an extensive presentence investigation and report, determined that Turner was *not* a dealer in drugs.

Thus, despite the fact that there was no intimation at all that Turner was dealing in heroin when the investigation began; the fact that the first investigation turned up nothing; the sale only occurred after the invention of a fictitious girl friend to play on the sympathy of a friend; and Turner was not found to be a dealer in drugs by the trial court, defendant was sentenced to 20 years in jail for his crime.

This is the type of overreaching by the police condemned by our Court in *Saunders v People,* 38 Mich 218 (1878), and this is a case in which entrapment occurred.

The actions of the state in this case cannot be permitted to go unchallenged by our Court. The judgment should be reversed and the defendant discharged.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH and LEVIN, JJ., concurred with SWAINSON, J.

WILLIAMS, J. *(for reversal).* The legal authorities and detailed facts are adequately set forth in the

opinions of my colleagues. It is sufficient for this opinion to emphasize two points. First, despite intensive and extensive investigation, no evidence was developed that defendant had engaged in the sale of heroin or even "soft" drugs. Second, the police through a sympathy-provoking deceit caused defendant to engage in what there is no evidence he had previously engaged in or that he would at that time have engaged in except for the action of the police, namely sell or procure heroin.

This situation in my mind falls squarely within the standard set by *Sorrells:* "[T]he defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials."[1] I would therefore reverse. However, I do not entirely accept Justice Swainson's new rule and I would modify the rule relied on by Justices T. E. Brennan and M. S. Coleman.

As in so many cases that come before this Court, reason and equity are not all on one side. The tension here is between two very valid reasons and equities. Justice Swainson, on the one hand, is rightly concerned about a rule which permits general evidence of defendant's "bad reputation" to justify reprehensible police action. Justice T. E. Brennan, on the other, correctly observes that without some artifice the police seldom, if ever, would make the "buy" necessary to prove the sale of heroin. I am sympathetic with both their concerns.

It seems to me that Justice Swainson's major objective could be achieved without looking only to the character of the police conduct, which I feel overlooks the fact that in most instances police

---

[1] *Sorrells v United States,* 287 US 435, 451; 53 S Ct 210, 216; 77 L Ed 413, 422 (1932).

conduct must be measured with respect to the conduct of the defendant. The police here in my mind would not have looked so bad if they had been coping with a known heroin pusher, let us say. What makes them look so bad is that they seem to have taken advantage of a rather unsophisticated "innocent".

In my opinion it would be well to construe the phrase "person otherwise innocent" more narrowly to refer to a person otherwise innocent of the specific type of crime charged. This would mean that police would have to prove, if properly challenged, that the defendant either had a prior record of crimes of the specific nature charged, had in this case for example made an offer to sell, actually had heroin, or some other matter destroying the concept that defendant was a person otherwise innocent of this type of crime.

This proof may not be the easiest to get, but our common-law system has been able to work out most similar challenges or to change the rules accordingly.

While this will require a higher standard of justification for otherwise questionable police practice, I believe it will not prohibit the making of "buys" that concern Justices T. E. BRENNAN and M. S. COLEMAN and myself—for that matter, I am sure, all the Court.

T. E. BRENNAN, J. *(dissenting)*. The defendant Turner was convicted in a bench trial on two counts, charging sale and possession of heroin.

On appeal, the Court of Appeals reversed the conviction for sale of heroin, and ordered the entry of a verdict of acquittal on that count. The Court of Appeals held that defendant acted only as a procuring agent for one Partridge, and that as the

agent of the buyer and not the seller, defendant was not guilty of violation of MCLA 335.152; MSA 18.1122.

No appeal was taken by the people from the decision of the Court of Appeals with respect to the count for the sale of heroin. With respect to the possession charge, the Court of Appeals affirmed the conviction.

This appeal was brought to our Court by the defendant, who seeks to reverse his conviction for possession of heroin. Defendant asks reversal on the ground that his possession was that of a conduit from the seller to Partridge. But the Court of Appeals held that a procuring agent could be guilty of possession and based its ruling on *Commonwealth v Harvard,* 356 Mass 452; 253 NE2d 346 (1969). The Massachusetts Supreme Court there stated:

"Admittedly, the defendant was in possession of marihuana on May 17 when Zacharo handed the plastic bag containing it to the defendant who in turn passed it to Martin. The defendant argues that such fleeting, momentary contact with the drug does not constitute the possession proscribed by the statute. We disagree. At the moment the defendant received the drug he had the control and power to do with it what he willed. In this case he chose to hand it immediately to Martin rather than hold it longer, keep it himself, or otherwise deal with it. Possession ought not to depend on the duration of time elapsing after one has an object under his control."

We granted leave to appeal because there is respectable authority in Michigan to the effect that fleeting, momentary contact with a contraband substance does not constitute unlawful possession. *People v Ninehouse,* 227 Mich 480; 198

NW 973 (1924), and *People v Leslie,* 239 Mich 334; 214 NW 128 (1927).

The facts in *People v Ninehouse,* 227 Mich 480, 481–482, 484 (1924), were as follows:

"Defendant was convicted of unlawfully transporting and having in his possession one pint of whisky and prosecutes review on exceptions before sentence. Defendant owned and operated a taxicab in the city of Muskegon and the night of June 21, 1923, responded to a call for a taxicab service, carried a man and a woman to where the man wanted to go, and when the man got out, the woman paid defendant $5 to take her for a ride in the country. While on the ride he claims she produced a bottle of 'moonshine whisky,' invited him to have a drink and, he being willing, she passed the bottle and he took a drink and handed the bottle back. During the course of the ride he took several drinks, each time returning the bottle to the woman."

There, the Court held as follows:

"In taking and drinking from and returning the bottle, was defendant guilty of unlawful possession while the bottle was in his hand and he was pouring the stuff down his gullet? We must answer, No."

The facts in *People v Leslie* were similar. There, the court affirmatively instructed the jury that the defendant was guilty of the offense of having intoxicating liquors in his possession and that it was their duty to find him guilty. According to the defendant's testimony, however, the jug of liquor belonged to one Dale Crown and was in Crown's possession at all times except when the defendant took drinks from it. The Court held that the possession acquired while taking a drink of liquor from a bottle was not a violation of the statute, citing *People v Ninehouse,* and concluded that the issue should have been submitted to the jury.

The facts in the case before us do not fit into the mold of the *Ninehouse* and *Leslie* cases. We are not talking here about one whose possession of the prohibited substance was incidental only to the consumption or use thereof. Indeed, there is no evidence in the case before us of any use of heroin by the defendant.

In the case at bar, there was testimony from which the trial judge could have concluded beyond reasonable doubt that the defendant was in the sole and exclusive possession of the heroin for a period of several hours during which time he alone transported it from Detroit to the City of Tecumseh in Lenawee County.

The Court of Appeals held that the defendant was not guilty of sale in that he acted only as a procuring agent in the acquisition and delivery of the heroin.

There is nothing in the nature of the agency relationship which negates the possibility of possession by the agent within the meaning of the statute. The word possession is used in the statute in its commonly understood sense. *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962).

Upon this record, unlawful possession of heroin was established. We should not extend the rule of *Ninehouse* and *Leslie* to a case in which the possession of the prohibited substance is not merely incidental to its use or consumption.

Despite the narrow purpose for which leave was granted, the majority of the Court upon submission of the cause has concluded that the testimony established an unlawful entrapment of the defendant, thus vitiating the conviction for possession of heroin.

The law of entrapment has very old and deep roots in this jurisdiction. Some of our early cases

have been the occasion of the expression of judicial indignation with and disapproval of official inducement to the commission of crime. The basis in logic and law for the defense of entrapment has not always been abundantly clear or consistent. Certain rules, however, surfaced. The first is that where the commission of the offense has been induced or participated in by a law enforcement officer, a private detective, or an individual employed for the purpose of ferreting out crime, such participation and purpose can be shown as affecting the credibility of the decoy.

This appears to have been the majority rule in *Saunders v People,* 38 Mich 218, 222–223 (1878). That case is notable also for the strong pronouncements in the concurring opinion of Justice MARSTON and for the concurring view of Chief Justice CAMPBELL to the effect that "the encouragement of criminals to induce them to commit crimes in order to get up a prosecution against them, is scandalous and reprehensible."

The case of *People v McCord,* 76 Mich 200; 42 NW 1106 (1889) is a classic example of entrapment and one which occasioned the strongest remonstrance by the Supreme Court. There, the defendant was intoxicated and was induced or encouraged by one Flint, a private detective, to break into a building which was owned by Flint's employers. The window was left unlocked and when the defendant and Flint entered the building, the defendant was brutally maimed while Flint was unharmed. While the opinion addresses itself to the problem of the improper use of deadly force in the apprehension of a felon, it also speaks with authority to the proposition that a person who takes active measures to persuade another to enter his premises and take his property cannot treat

the taking as a crime. In this respect, the *McCord* case seems founded in the doctrine discussed in *People v Liphardt,* 105 Mich 80; 62 NW 1022 (1895). There, quoting from text authority, the Court points out one fundamental basis in reason for the doctrine of entrapment. It lies in the notion of consent, that is to say, that where the supposed victim of a crime has in fact connived and consented to the commission of it, the act is not in fact criminal. This is particularly true in cases of larceny or burglary and, when combined with the brutality and cowardice described in *People v McCord,* the conduct is truly reprehensible.

These cases might well be described as instances of true or classic entrapment. It is important to note that in such instances, the previous criminal disposition of the defendant is not a factor which mitigates against a finding of entrapment.

Indeed, the concurrence of Justice MARSTON in *Saunders v People* would suggest that the defense of entrapment in a proper case is especially available to one who lacks the normal capacity to avoid temptation.

"The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case. If such were the fact, then the greater reason would seem to exist why he should not be actively assisted and encouraged in the commission of a new offense which could in no way tend to throw light upon his past iniquities, or aid in punishing him therefor, as the law does not contemplate or allow the conviction and punishment of parties on account of their general bad or criminal conduct, irrespective of their guilt or innocence of the particular offense charged and for which they are being tried. Human nature is frail enough at best, and requires no encouragement in wrong-doing. If we cannot assist another and prevent him from violating the laws of the

land, we at least should abstain from any active efforts in the way of leading him into temptation. Desire to commit crime and opportunities for the commission thereof would seem sufficiently general and numerous, and no special efforts would seem necessary in the way of encouragement or assistance in that direction."

But the adaptation of the doctrine of entrapment to a charge of unlawful sale or possession of contraband is not so readily or easily made. The basis of consent is generally wanting. Indeed, the crime of unlawful sale always involves a buyer and a seller. The element of inducement, encouragement, or enticement, which may be probative in a claimed entrapment to larceny, is, at best, an ambivalent standard in a case of unlawful sale.

Unlawful sales are rarely, if ever, intentionally made to persons known to be law enforcement officers. Unlawful sales are rarely, if ever, made except when the confidence of the seller has been gained by the purchaser.

The notion that a crime is the product of entrapment, where the idea for the commission of the crime is germinated in the mind of the officer—the so-called creative activity test—is peculiarly inapplicable in a prosecution for unlawful sale. To rule otherwise would be to hold that government may only proscribe the offering and not the sale. Each case would turn upon the question of whether the illegal bargain began with an offer to sell or an offer to buy.

Our decisions have been uniform in holding that inducement, encouragement, or invitation to the making of an unlawful sale does not constitute entrapment, even where misrepresentations, connivance, trickery, or subterfuge have been used to gain the confidence of the seller. *People v Murphy,* 93 Mich 41; 52 NW 1042 (1892); *People v Curtis,* 95 Mich 212; 54 NW 767 (1893); *People v Rice,* 103

Mich 350; 61 NW 540 (1894); *People v Everts,* 112 Mich 194; 70 NW 430 (1897); *People v Lalonde,* 171 Mich 286; 137 NW 74 (1912); *People v McIntyre,* 218 Mich 540; 188 NW 407 (1922); *People v Christiansen,* 220 Mich 506; 190 NW 236 (1922); and *People v England,* 221 Mich 607; 192 NW 612 (1923).

In the case before us, the trial judge in his findings of facts specifically determined, that the agent Partridge made only one request for heroin; that Partridge was not a knowledgeable person in the area of narcotics but that the defendant was; that the defendant knew how to use heroin and how to make a profit on the sale of drugs.

Under all the circumstances, the decision of the trial judge and the Court of Appeals should be affirmed.


M. S. COLEMAN, J. *(dissenting).*


*FACTS:*

. The issue which was accepted by this Court for resolution was whether such contact as the defendant had with heroin within the following factual situation warranted a conviction for possession. This Court, however, has undertaken an analysis of the doctrine of entrapment, and it is to this analysis that the following dissent is directed.

Defendant was convicted on July 9, 1970 in a non-jury trial for possession and sale of narcotics. He was sentenced to a term of 4 to 10 years in prison on the former and 20 to 30 years on the latter. The Court of Appeals affirmed as to possession and reversed as to sale. Leave was granted to review the conviction of possession of heroin.

The evidence indicates that defendant and Melbourne Partridge became acquainted in 1967. De-

fendant was then employed by Ford and Partridge was a truck driver. Over the course of two years defendant offered and sold to Partridge some prescription pills of different colors. (Partridge had complained of drowsiness during long trips.) The ingredient of the pills analyzed on one occasion was found to be caffeine. On other occasions, Partridge flushed them down the toilet.

In 1969 Partridge became acquainted with State Police Trooper James Ewers and introduced Ewers to defendant calling him a fellow truck driver. Partridge and Ewers sought to determine if the defendant was dealing in narcotics. They were unable so to determine and the investigation was closed.

A few months later, in February 1970, a new investigation was commenced at Ewers' request. Partridge and Ewers claimed an interest in antiques. Defendant had left his position at Ford to devote his full time to that business.

During the course of the second investigation, Partridge told defendant that he had a girl friend who was a heroin addict and having problems supplying her habit. As Ewers related the conversation on direct-examination:

"*A.* He [Turner] said, 'Well, the two semi drivers,' and—and Mr. Partridge said, 'Hi, Tom, how are you?' And he said, 'What do you need, Mick, more pills?' And Mr. Partridge said, 'Yes,' and he said, 'Well, what do you want?' And at that time Mr. Partridge told him.

"*Q.* Told him what?

"*A.* He told him that he would like some pills; also some heroin for a girl friend that he had or that he was going out with in Monroe.

"*Q.* You recall the exact conversation?

"*A.* Word for word, no; I remember basically what was said.

"*Q.* Was there any statement about, 'Anything I can get,' or anything of this sort?

"*A.* Yeah, he said—Mr. Turner said, 'What do you want?' And Mr. Partridge said, 'I'll take anything I can get,' and he said, 'I would like some pills, some—some heroin for this girl friend in Monroe, and also some marijuana.'

"*Q.* All right; did he use the name—use the word heroin?

"*A.* Yes.

"*Q.* Did he use the word marijuana?

"*A.* Yes, he may have said grass or something to this effect, but he implied marijuana, and I do believe he said it.

"*Q.* And then what happened?

"*A.* Mr. Turner said that heroin was bad stuff, and he said but it's easier to get than bennies and that he would have—

"*Q.* What else did he say at this particular time on this particular first phrase in this regard?

"*A.* I'm sorry, I don't quite follow.

"*Q.* I'm interested in his exact words now as near as you can recall his exact words. He said, 'It was bad stuff, but it's easier to get.'?

"*A.* Yes, sir; after Mr. Partridge told him he wanted heroin, he said, 'That's bad stuff, but it's easier to get than bennies,' and he said, 'I'll have no trouble getting it.'

"*Q.* And then what was said?

"*A.* There was a—there was a short conversation there about money—excuse me.

"*Q.* Prior to the conversation about money, was there any more said about heroin being bad for you other than what you have just mentioned?

"*A.* If there was, I don't remember it. I do remember that he said, 'That's bad stuff, but it's easier to get than bennies,' and he said he would have no trouble getting it.

"*Q.* All right; and then what was the next thing that was said? You said something about money?

"*A.* Yeah, there was a conversation there about

money. As to who brought it up first, I don't know. I do remember Mr. Turner saying something to the effect that he did not have enough, and that he would need some, and I'm sorry, I do remember Mr. Turner did ask Mr. Partridge how many heroin he wanted, and at that time Mr. Partridge said three shots, and an amount of twenty dollars was agreed upon. Mr. Partridge said that he did not have it at that time, but that if he would stop at his house on the way to Detroit in the morning, Mr. Partridge would give it to him. He then pulled a small plastic pillbox out of his pocket, held it in his hand. He showed it to us, and he said, 'This is all I have got left. I'm going to Detroit to get some more for myself tomorrow,' and that's when they agreed to meet at Mr. Partridge's home where the transaction of money—

"*Q.* What part did you play in this particular conversation?

"*A.* In the conversation itself, I did not play any part as far as doing any speaking or anything to this effect, at least not that I can recall right now. I conversed with Mr. Turner casually to say hello and—and I'm certain I said other things to him. What they were, I don't know. I was with—I was there mainly because I was the officer in charge of this case, but I was also there to witness what Mr. Partridge had said to Mr. Turner and what Mr. Turner had said in reply or vice versa."

The transcript indicates that the transaction was very low keyed, with no urging, begging or pleading on the part of Partridge. In fact, there had been no plan at all as they approached Turner. They were just "playing it by ear". There was just Turner's question, "What do you need, Mick, more pills?" and Partridge's reply as to pills, heroin and marijuana followed by Turner's ready compliance. The purchase occurred on February 24th when Turner was going to Detroit in any event to buy some pills for himself. Partridge asked for 100 pills *to sell.* Turner stated that he bought the approxi-

mately 100 Benzedrine pills from his brother, the heroin from an addict he knew and the marijuana from a bartender. (A tape recording revealed Turner as saying that his brother had about 5,000 bennies.)

Subsequently, Partridge and Ewers again used the "girl friend" story to ask defendant to make a heroin purchase. Defendant refused but did drive them to Detroit so they could make contact through him with the pusher. Partridge and Ewers did make a purchase.

The bench trial lasted six days. The central issue of entrapment was presented in defendant's motion for a directed verdict made at the close of the prosecution's case. Defense counsel said defendant "was entrapped by their subtleties and their devices and their methods over a period of months to a point where he felt indebted perhaps or felt somewhat committed to assist a friend at a time when he felt that friend was in a time of need." He said Partridge and Ewers used "a whole system of fantasy, of lies, of inducements, or persuasions" to ensnare defendant. The prosecution responded saying that "Gaining someone's confidence, perhaps even making the request, is not entrapment." The court took the motion under advisement.

In the findings of fact the court referred to a conversation between defendant, Partridge and Ewers which was recorded on tape when defendant returned from Detroit with the heroin. The court said:

"[T]hrough this whole conversation, the Defendant was the expert on it. He was the one who knew his way around. In fact, Mr. Partridge in that conversation didn't sound too bright at all. The Defendant knew how and where to get anything. He knew how to dry the

grass and how to use the heroin and how to make a profit on the sale of drugs."

The court was "convinced the Defendant would sell to anyone he knew and he felt it was safe to sell to." The court had serious doubts about defendant's veracity and did not "believe the Defendant was persuaded or induced by any trickery or promises or anything else to do something he wouldn't have done if he had felt it was safe." The court concluded by saying "there was no entrapment as we know entrapment under the law."

The Court of Appeals affirmed part of the conviction. Its review of the evidence disclosed no entrapment. It felt the conduct of Partridge and Ewers merely provided an opportunity for the commission of the offense and defendant himself was willing to so act.

However, the Court did recognize the defense of a procuring agent for the sale of narcotics. The theory apparently rests on the assumption defendant acted on the purchaser's behalf rather than on his own and perhaps did not profit from the transaction. (The judge stated that he could not find whether or not there was a profit to Turner.) Our Court of Appeals was

"convinced that a procuring agent who buys from a third party with funds provided by his principal and at the principal's request is far different from the employee of a narcotics peddler. It is only the latter individual who can in any sense be considered to be a seller of narcotics." 38 Mich App 479, 487; 196 NW2d 799 (1972).

Despite reversing the conviction for sale, the Court felt "a conviction for 'possession' during the time when the procuring agent acted as a conduit for the illegal drug transfer is valid." (p 488.) The

Court noted defendant had total control of the narcotics which was sufficient to sustain a finding of possession. Defendant appeals from that finding.

The people did not seek leave to appeal reversal of the conviction for sale, so the conviction in question is as to possession only.

It may be true, as Justice Swainson indicates, that this Court is not bound by those decisions of the United States Supreme Court which deal with entrapment. However, it cannot be denied that they merit our most careful consideration, especially since our majority opinion adopts what has consistently been a minority position in that Court.

In the first place, the case before our Court does not contain the hazards of persuasion of the jury by use of prior record or "propensities". Much of the argument of Justice Stewart's dissent in *Russell* (pp 19–21), therefore, is irrelevant to this factual situation.

Also irrelevant is the statement on p 23 of the majority opinion to the effect that Mr. Turner was sentenced to 20 years in prison (for sale of heroin). He has been acquitted of the charge of sale and the decision has not been appealed. The sole offense before this Court and the sole remaining charge is possession of heroin (sentence 4–10 years).

The importance of the prevailing opinion lies in the fact that it raises a new barrier to the conviction of those participating in criminal activity. A short review of the prevailing United States Supreme Court cases is appropriate to this dissent.

The first Supreme Court case to recognize the defense of entrapment was *Sorrells v United States,* 287 US 435; 53 S Ct 210; 77 L Ed 413 (1932). The only question was "whether the evi-

dence was sufficient to go to the jury upon the issue of entrapment." (p 439.) The Court reversed defendant's conviction for possessing and selling whiskey because the trial judge had refused to submit the question to the jury.

In the course of the opinion, Chief Justice Hughes said the defendant, "otherwise innocent," had been "lured" into commission of the crime by the "repeated and persistent solicitation" of the agent. (p 441.) He then went on to say at 441–442:

"It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."

The doctrine of entrapment was reexamined in *Sherman v United States,* 356 US 369; 78 S Ct 819; 2 L Ed 2d 848 (1958). Defendant was befriended by a government informer while both were being treated for addiction. Indicating that he was undergoing great suffering, the informer repeatedly asked defendant to purchase narcotics for him. Apparently the informer also induced the defendant to resume his habit. Once these results were reached, the informer told the government officers. He was supplied with government money to make additional purchases from defendant. These purchases were witnessed by the officers.

Five members joined in an opinion written by Chief Justice Warren which concluded there was entrapment as a matter of law. The Justices reaffirmed *Sorrells.* They said at 372–373 that "the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment." They

said the case "illustrates an evil which the defense of an entrapment is designed to overcome." (p 376.) I agree.

The theories in *Sorrells* and *Sherman* have been repeated in *United States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973). A Federal undercover agent was investigating the illicit manufacturing of methamphetamine. The agent supplied the defendant with a legally available but difficult to obtain ingredient. In return, he received one-half of the drug produced.

Defendant was convicted in a Federal district court for the unlawful manufacturing, processing and sale of methamphetamine. The Federal Circuit Court of Appeals reversed saying "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." 459 F2d 671, 673 (CA 9, 1972). The Supreme Court reversed the Federal Circuit Court of Appeals.

Justice Rehnquist writing for the majority said that while there may be situations "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction * * * the instant case is distinctly not of that breed." (pp 431–432.) The tactics used by the agent were not deemed violative of fundamental fairness. (p 432.)

The majority specifically refused to overrule *Sorrells* and *Sherman* (p 433) and thought the decision of the Federal District Court of Appeals in this case quite unnecessarily introduced "an unmanageably subjective standard." (p 435.) In words applicable to the instant case, Justice Rehnquist wrote at pp 435–436:

"*Sorrells* and *Sherman* both recognize 'that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution' 287 US, 441; 356 US; at 372. Nor will the mere fact of deceit defeat a prosecution, see, *e.g., Lewis v United States* 385 US 206, 208–209 [87 S Ct 424; 17 L Ed 2d 312] (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes in to play."

The Court concluded that defendant was an unwary criminal not an unwary innocent and thus not entrapped.

In the instant case as in *Russell,* the law enforcement agent was investigating illegal drug related activity. In *Russell* it was the manufacture and sale of "speed". In the present case, it was the possession and sale of narcotics.

As stated in the opinion of Justice T. E. BRENNAN, "[u]nlawful sales are rarely, if ever, intentionally made to persons known to be law enforcement officers. Unlawful sales are rarely, if ever, made except when the confidence of a seller has been gained by the purchaser."[1] Surely, the procedure used by the officer here "is a recognized and permissible means of apprehension". *Russell,* p 432. These tactics do not violate long established legal standards. Nor do I see Mr. Turner (after a detailed reading of the transcript) as a "nice guy" betrayed and undeserving of a conviction of possession.

The broad interpretation of the entrapment defense as proposed by the majority opinion could block or interfere further with the efforts of police

---

[1] See opinion of Justice BRENNAN, p 31.

to apprehend and convict persons involved in the narcotics and dangerous drugs traffic.

I cannot condone the one-eyed view which looks only at the police officer. I encourage the use of both eyes, the better to see and judge the total transaction.

Defendant was caught but defendant was not entrapped.