PEOPLE v SMALLS

Docket No. 72931. Submitted June 5, 1984, at Detroit.—Decided November 27, 1984.

Nathaniel Smalls and others were charged with conspiracy to commit prostitution. Defendants moved for dismissal based on entrapment and the 36th District Court, after an evidentiary hearing, granted the motion, finding entrapment. The people appealed and the Recorder's Court of Detroit, Samuel C. Gardner, J., affirmed. The people appealed by leave granted. *Held:*

1. The findings of a trial court regarding a defendant's alleged defense of entrapment should not be reversed on appeal unless such findings are clearly erroneous.

2. The test for finding entrapment is objective: whether agents of the government have acted in a manner likely to instigate or create a criminal offense. To find entrapment, defendants must show that police officers impermissibly manufactured or instigated a crime.

3. The district court clearly erred in finding entrapment.

Reversed and remanded.

1. CRIMINAL LAW — ENTRAPMENT — FINDINGS OF FACT.

The findings of a trial court regarding a defendant's alleged defense of entrapment should not be reversed on appeal unless such findings are clearly erroneous.

2. CRIMINAL LAW — ENTRAPMENT.

The test for finding entrapment is objective: whether agents of the government have acted in a manner likely to instigate or create a criminal offense; to find entrapment, defendants must show that police officers impermissibly manufactured or instigated a crime.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Dep-

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law § 202 *et seq.*

Entrapment defense in sex-offense prosecutions. 12 ALR4th 413.

uty Chief, Civil and Appeals, and *Andrea L. Solak,* Assistant Prosecuting Attorney, for the people.

*Clarice Y. Larkins,* for defendant Allen Bulger.

*Duane Elston,* for defendant Wendy Ball.

*Stone & Richardson, P.C.* (by *W. Frederick Moore),* for defendant Nathaniel Smalls.

*Levenson, Disner, Ruby & Fruitman, P.C.* (by *Marshall C. Disner),* for defendant Sharon Bond.

*Sheila H. Hughes,* for defendants William Brooks and Terrendus Weaver.

Before: R. M. MAHER, P.J., and HOOD and R. B. MARTIN,* JJ.

PER CURIAM. The people charged defendants with conspiracy to commit prostitution, MCL 750.157a(c); MSA 28.354(1)(c), and MCL 750.448; MSA 28.703. Defendants moved for dismissal based upon an entrapment theory and, following an evidentiary hearing, *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), a 36th District Court judge dismissed the charge against all defendants. The people appealed to the Recorder's Court of the City of Detroit, which affirmed the dismissal. This Court granted the people's application for leave to appeal. We reverse and reinstate the charge against all defendants.

The facts taken from the evidentiary hearing are summarized as follows.

Detroit Police Officer Gerardo Pecchia said his Vice Section received anonymous phone calls tipping the officers about a possible prostitution

---

* Former circuit judge, sitting on the Court of Appeals by assignment.

"ring" or operation emanating from two bars or lounges nearby the Westin Hotel in Detroit's Renaissance Center. Officer Pecchia began an undercover investigation of these accusations in August, 1982. He and Officer James O'Brien rented rooms in the Westin and frequented the bars as customers. On August 7, 1982, Officer Pecchia was accosted and solicited by a woman. He did not arrest her but continued his investigation. On August 14, 1982, Officer O'Brien began talking to defendant Nathaniel Smalls, a doorman at DJ's bar. Officer O'Brien said, "Boy, I'm really bored seeing all these housewives dancing". Smalls offered to help O'Brien relieve his boredom. Soon after, three women approached Officer O'Brien and accosted and solicited him. Officer O'Brien did not arrest these women but continued with the investigation.

Officers Pecchia and O'Brien decided to see if Officer O'Brien could "obtain a girl" from Smalls. On August 14, 1982, Smalls and Officer O'Brien met in the bar and Smalls offered to help O'Brien "get a girl". Smalls said he needed $20 for his "overhead" to do so. Smalls then asked defendant Weaver to help him find "Tracey", defendant Paula Frank, because O'Brien wanted a whore. The defendants located Frank. She said, "I understand from Nate, I believe you want to go out". She told Officer O'Brien that it was "house policy" to order drinks and dance a bit before going to O'Brien's room. They did so and set a price for her services of $200.

After Officer O'Brien and defendant Frank went to a hotel room, Officer Pecchia, as planned, came to their door and announced he was a hotel security guard. He said Officer O'Brien registered as a single and it was against hotel policy to have unmarried couples together in rooms. Officer Pecchia checked defendant Frank's identification,

wrote down her name and address, and escorted her out of the Renaissance Center instructing her not to return. Officer O'Brien returned to DJ's Bar to tell defendant Smalls and defendant Brooks that the "girl" was taken out by a hotel security guard. Smalls said it was too bad and advised Officer O'Brien not to open his hotel door to security personnel in the future. Defendant Brooks told Officer O'Brien that any "girl" we get is o.k.

On August 19, 1982, Officer O'Brien again registered at the Westin Hotel and later talked to defendant Smalls. He told Smalls that he was thinking about having a party in a couple of days. Smalls asked O'Brien if he was going to have girls there. O'Brien responded that he didn't think so because he didn't know too many. Smalls offered to get him some at $40 per girl. Later, defendant Weaver asked if he could have the same deal as Smalls' with Officer O'Brien. Defendants Bulger and Weaver gave Officer O'Brien defendant Paula Frank's phone number for obtaining additional girls.

In a telephone conversation, defendant Frank asked Officer O'Brien about the party. She asked if she could attend and asked if there would be any other girls there. Officer O'Brien said no because he didn't know too many. Frank asked Officer O'Brien if he would like 10 to 20 girls which she would obtain at $50 a girl. Officer O'Brien said that earlier defendant Smalls had asked for a couple of dollars for each girl defendant Frank would bring to the party. Defendant Frank also inquired if defendant Smalls was going to "get any girls" for Officer O'Brien.

At the party, on either August 21 or 22, 1982, Officer O'Brien and defendant Frank devised a sign-in list to keep track of the girls who attended

the party. That night, the defendants were arrested.

The District Court judge's decision states:

"In this matter it is apparent from the testimony which has been taken over a period of three sessions, I believe, four, that the anonymous tip had been made to the Detroit Police or some authorities that there was prostitution flourishing at the Westin Hotel. The Vice Squad set up a surveillance there for about four weeks and made a couple of cases but they weren't satisfied, they couldn't find anything. They then decided to go back, apparently from the testimony, and see if it wasn't true.

The truth of the tip is not in question here. I think the issue is whether or not because the question is entrapment, whether or not there was entrapment of the conspiracy. And so if there was a conspiracy to commit prostitution the issue is whether or not there was entrapment of conspiracy to commit prostitution although the prosecutor says that the question of conspiracy is not important, it's just the entrapment.

"It appears that on August 22nd there was a party, there was a sign-in sheet, and the people who attended the party were arrested and that was the basis of the accosting and soliciting which was the basis for the conspiracy to commit prostitution at the party on the 22nd.

"I think as Mr. Elston or perhaps one of the other defense counsels alluded to, there were other acts of accosting and soliciting made but none of the parties were charged. There apparently was prostitution going on in the Westin by housewives, salesgirls, and probably salesboys, and other people then and now.

"I don't think that the tactics of the Detroit Police were reprehensible but I think that the continuing investigation was reprehensible.

"It is the opinion of this court that there was entrapment and the court so rules and dismisses this matter as to all remaining defendants."

After reviewing the evidentiary hearing record

on appeal, the Recorder's Court judge noted that he could find no evidence of a conspiracy on that record, then stated:

"To be sure, the efforts of the police to entrap were gross. It is apparent that they spent a substantial amount of public money and devoted a tremendous amount of police time and manpower trying to inveigle the defendants into a common plot to engage in prostitution or procurement. If the lower court erred at all it was merely because it's findings of entrapment may have been legally unnecessary in view of the lack of evidence establishing the crime of conspiracy in the first place.

"In *People v Wisneski,* 96 Mich App 299, 303; 292 NW2d 196 (1980), *lv den* 409 Mich 928 (1980), [the] Court of Appeals said:

" 'If the methods used by the police are repugnant to fair play and justice, the courts, in an attempt to discourage the practice and to uphold confidence in the fair and honorable administration of justice, will refuse to permit prosecution. *The real concern in entrapment cases is "whether the actions of the police were so reprehensible under the circumstances, that the Court should refuse, as a matter of public policy, to permit* a conviction to stand". *People v Turner, supra,* 22.'

"It follows then, that if trial courts are mandated as they are under *People v D'Angelo,* [401 Mich 167; 257 NW2d 655 (1977)] to determine the question of entrapment by pre-trial motions, where entrapment is found, no trial or conviction should take place. This Court agrees with the lower court that the conduct of the police was reprehensible. Extreme efforts were exerted and defendants were individually *[sic]* exhorted to become involved in some kind of activity, apparently sexual. Each may well have had the propensity for so doing, but the record reflects no agreement between any two or more of them, either express or implied, to carry such propensities into execution.

"The district court was not, in the opinion of this Court, in error in finding entrapment, and its determination is affirmed."

The people now argue that both lower courts clearly erred by finding entrapment in this case. The people are correct in stating that the standard of review of a trial court's finding of entrapment is whether it was clearly erroneous. *People v LaBate,* 122 Mich App 644, 647; 332 NW2d 555 (1983); *People v Weatherford,* 129 Mich App 359, 360; 341 NW2d 119 (1983).

We first note that the reviewing court's comments regarding the lack of evidence of a conspiracy are beside the point. The hearing below was an evidentiary hearing at which defendants were to meet their burden under *Turner, supra,* of proving entrapment. The hearing was not a preliminary examination, nor will there be such an examination since this is a misdemeanor charge. Judicial review of the adequacy of evidence in support of the conspiracy charge must await, apparently, a motion for a directed verdict after the prosecution's case, if and when there is a trial.

The test for finding entrapment in Michigan is objective: whether agents of the government have acted in a manner likely to instigate or create a criminal offense. *People v Turner, supra; People v Killian,* 117 Mich App 220, 222; 323 NW2d 660 (1982), *lv den* 414 Mich 944 (1982). To find entrapment defendants must show that police officers impermissibly manufactured or instigated a crime. *Turner, supra; People v White,* 411 Mich 366; 308 NW2d 128 (1981).

We find that the lower courts clearly erred by finding the police activity in this case entrapment. Rather, the officers undertook a valid undercover operation to determine whether a prostitution operation was afoot at the Westin Hotel, emanating from nearby bars. They did so only after receiving repeated calls regarding such activity from nonpublic sources and after observing suspicious activ-

ities suggesting such activity in the bars. That suspicious activity included the activities of several male employees at the bars. The fact that the officers posed as bar customers or rented rooms at the Westin does not make their behavior reprehensible. Moreover, we agree with the prosecutor's argument that, prior to arranging the party on the 21st or 22nd of August, the police officers had encountered voluntary offers to provide sexual partners for money from at least defendants Bulger, Weaver, Brooks and Smalls. The evidence also shows that defendant Frank was involved with at least defendants Smalls and Weaver in providing such services.

Nor do we find, despite defendant Frank's argument to the contrary, that the police officers' activities in planning a party escalated Frank's criminal culpability from that of a prostitute to that of a madame. *Killian, supra,* p 223. Rather, the evidence tended to show that Frank, like Smalls, Weaver, Bulger and Brooks, offered her services to procure girls for the party. The officers never explicitly sought out defendants for the purpose of asking them to procure prostitutes for them. Compare the facts in *White, supra,* and *Killian, supra.* Nor were there any extreme appeals to sympathy or friendship involved in this case. Compare *Turner, supra,* and *People v Gratzer,* 104 Mich App 705; 305 NW2d 300 (1981), *lv den* 411 Mich 961 (1981).

While we may agree that it is difficult to view the existence of prostitution in a convention city such as Detroit as one of the great evils facing Detroit law enforcement officers in 1982, we cannot say that it is entrapment for the police and prosecutor to target their resources on that crime.

Because we find that the lower court clearly erred by finding entrapment, we reverse, reinstate the charges, and remand to the district court.

Reversed and remanded.