PEOPLE v BROWN

Docket No. 97840. Submitted March 17, 1987, at Lansing. Decided
    September 21, 1987. Leave to appeal denied, 429 Mich —.
  Basil W. Brown was bound over for trial in Ingham Circuit Court
    on two counts of delivery of marijuana, two counts of delivery
    of cocaine, one count of possession of cocaine, and one count of
    possession of marijuana following a preliminary examination in
    district court. Defendant, claiming that he had been entrapped
    and that there was insufficient evidence of delivery of cocaine,
    filed a motion to quash the information, which the trial court,
    James T. Kallman, J., denied. The Court of Appeals subse-
    quently denied defendant's application for leave to appeal.
    Defendant filed a motion in the trial court for a reconsideration
    of its ruling, which the trial court denied. The Court of Appeals
    denied a second application for leave to appeal. Defendant
    sought leave to appeal in the Supreme Court. The Supreme
    Court, in lieu of granting leave to appeal, remanded the case to
    the Court of Appeals for consideration as on leave granted. 428
    Mich 851 (1987). The Court of Appeals issued an order staying
    the proceedings in the trial court.
      The Court of Appeals *held:*
      1. Police conduct consisting in this case of promising Kather-
    ine Roberts, who admitted to being a prostitute and heroin
    addict, a place to stay, food to eat, spending money, transporta-
    tion to see her children, and the opportunity to enroll in a drug
    rehabilitation program in exchange for her continued relation-
    ship with defendant and her cooperation as an informant in an
    investigation of defendant is reprehensible police conduct but
    did not induce or instigate the commission of the crimes alleged
    despite the police's expectation that the informant would, and
    she in fact did, gain access to the defendant's apartment, have
    sex with him, smoke marijuana, and take her own syringes
    with which to inject herself with cocaine.
      2. There was sufficient evidence at the preliminary examina-
    tion to bind defendant over on charges of delivery of cocaine.
      Affirmed.

REFERENCES

Am Jur 2d, Criminal Law §§ 202 *et seq.*
Burden of proof as to entrapment defense—state case. 52 ALR4th
    775.

Beasley, J., concurred separately to note that defendant, by choosing not to testify at the preliminary examination or evidentiary hearing in circuit court, left uncontradicted the testimony of Roberts and the police investigator as to the nature of the relationship between Roberts and defendant and the conduct by police which defendant assailed as entrapment. Judge Beasley concluded from Roberts' testimony that the illicit relationship between defendant and Roberts as well as the use of marijuana and cocaine in the course of their liaison were ongoing for a period of years prior to the investigative efforts of the police. Thus, Judge Beasley concluded that it cannot be said, nor has defendant shown by a preponderance of the evidence, that the police instigated the alleged offenses or induced defendant to commit them. With regard to the question whether there was sufficient evidence to support defendant's bindover on the cocaine delivery counts, Judge Beasley noted that the evidence at preliminary examination established that an actual, constructive or attempted transfer of cocaine from defendant to Roberts occurred in this case, satisfying the controlled substances act definition of the term "delivery."

### Opinion of the Court

1. Criminal Law — Defenses — Entrapment.

The defense of entrapment consists of (1) intolerable police conduct that (2) induces or instigates the commission of a crime.

### Concurrence by Beasley, J.

2. Criminal Law — Defenses — Entrapment.

The objective test for entrapment focuses on whether the actions of the police were so reprehensible under the circumstances that public policy will not permit the defendant's conviction to stand; under this test the defendant's guilt or innocence is irrelevant, and the burden is on the defendant to show by a preponderance of the evidence that he was entrapped.

3. Criminal Law — Appeal — Defenses — Entrapment.

The Court of Appeals will not reverse a trial court's ruling on an entrapment motion unless the ruling is clearly erroneous.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Donald E. Martin,* Prosecuting Attorney, and *Paula M. Zera,* Chief, Criminal Division, for the people.

*Dunnings & Frawley, P.C.* (by *Stuart J. Dun-*

*nings III* and *Stuart J. Dunnings, Jr.*), for defendant.

Before: MacKenzie, P.J., and Beasley and E. A. Quinnell,* JJ.

E. A. Quinnell, J. The facts of this case are set forth in the concurring opinion of Judge Beasley.

We agree with Judge Beasley's disposition of the delivery issue.

We also agree with his result as to the entrapment issue, but only reluctantly.

We agree that some of the police conduct is merely distasteful; after all, if the KGB can use sex to gain access to the American Embassy in Moscow, we suppose that the Organized Crime and Public Corruption Unit of the Department of Attorney General can use sex to gain access to the defendant's apartment in Lansing. We find other aspects of the police behavior to be truly reprehensible. Their confidential informant was a known prostitute, known heroin addict, and known user of other illicit drugs. She was otherwise vulnerable in that an additional prostitution charge was pending against her. They promised her a place to stay, food to eat, spending money, transportation to see her children, and the opportunity to enroll in a drug rehabilitation program if she would agree to work as an undercover agent for them with regard to this defendant and perhaps as many as three other investigations.[1] The cooperation expected of her was that she would gain access to the defen-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] The timing of her involvement in the drug rehabilitation program is not clear from the record. At the preliminary examination held on December 9, 1985, agent Kalder testified: "We have planned to enroll her in a drug rehabilitation program after the preliminary exam." However, it also appeared that the informant previously had spent one night in a drug rehabilitation program but had left that program because of her own desire. Presumably the one-night exposure to the

dant's apartment, have sex with him, and smoke marijuana, and they expected her to take her own syringes so that she could inject herself with cocaine. Admittedly the agents informed the informant to avoid sex if she could, but that admonition ignores reality. All of this activity took place after the agent had professed to the informant at the beginning of their relationship that the police wanted to help the informant get off drugs and make sure she had a place to stay.

Both during the entrapment hearings at the trial court level and on appeal the police attempted to justify their actions by saying, in effect: "We only expected her to do what she had been doing before." Of course, what the informant had been doing before was committing crimes involving the use of illicit drugs, and engaging in a meretricious relationship with the defendant. In our view, the fact that such acts had taken place in the past is not an excuse for the police to promote such activity.

However, this reprehensibility concerns the relationship between the police and the informant, not the relationship between the police/informant and the defendant. Starting with *People v Moore,* 73 Mich App 514, 517; 252 NW2d 507 (1977), several panels of this Court have determined that the defense of entrapment consists of

(1) intolerable police conduct that (2) induces or instigates the commission of a crime.

See also *People v Barker,* 97 Mich 253, 255; 293 NW2d 787 (1980), rev'd on other grounds 411 Mich 866 (1981); *People v Larcinese,* 108 Mich App 511;

program took place after the informant had performed her part of the deal and the defendant was arrested, but before the preliminary examination.

310 NW2d 49 (1981); *People v Weatherford,* 129 Mich App 359, 361; 341 NW2d 199 (1983); *People v Crawford,* 143 Mich App 348; 372 NW2d 550 (1985), lv gtd on other grounds 424 Mich 879 (1986); *People v Mulkey,* 153 Mich App 737, 739; 396 NW2d 514 (1986).

The reprehensible police conduct here could be considered as a causative factor in the commission of the charged offenses only in the broadest meaning of the term "cause"—if the police had not dealt most unfairly with the informant, she probably would not have contacted the defendant, and therefore the charged offenses would not have occurred or (as to the possession counts) would not have been discovered. However, the police treatment of the informant did not induce or instigate the commission of the crimes, it merely provided an incentive for the informant to contact the defendant. Even the police approval of the informant's taking syringes into the defendant's apartment for shooting up with cocaine, reprehensible though such approval was, did not induce the defendant to commit the delivery of cocaine, since the informant could have used the cocaine without her own syringe, and in fact did so on at least one occasion.

Our research has not uncovered any Michigan Supreme Court decision which has specifically addressed the question whether reprehensible police conduct must have induced or instigated the crime. The policy considerations expressed by Justice Stewart's dissent in *People v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973), and by the Michigan Supreme Court in *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), suggest that there may be no need for the defendant to prove that the reprehensible police conduct induced or instigated the crime. However, given the facts of

this case and the ten-year history of that require-
ment in the Court of Appeals, we cannot find the
trial court's ruling that defendant had not proved
entrapment to be clearly erroneous.

Both the trial judge and Judge BEASLEY mention
defendant's failure to testify at the entrapment
hearing. His decision to testify or not to testify is
totally irrelevant to a determination of whether he
sustained his burden of proving entrapment.

Judge BEASLEY also suggests that the social men-
ace represented by the use of cocaine is so serious
that some extraordinary police measures should be
tolerated. We have searched in vain for a case that
suggests that a balancing test should be used in
entrapment cases to compare the reprehensibility
of the police conduct and the reprehensibility of
the offense charged. If there were authority for
such a position, we would have no difficulty in
finding that the conduct of the police was more
reprehensible than the conduct of the defendant.
The record indicates that, although the initial
relationship between defendant and the informant
developed out of the informant's being a prosti-
tute, that relationship developed into a friendship
such that, in more recent times, the informant
typically went to the defendant's apartment, the
two engaged in sex, and shared whatever mari-
juana or cocaine the defendant happened to have.
There is no suggestion that the defendant is in any
sense a dealer; in fact, the hiatus that existed in
the relationship between the informant and the
defendant over the $130 apparently resulted from
the informant's agreement to buy some drugs for
the defendant, not from the defendant. The defen-
dant's treatment of the informant was certainly
not exemplary, but the police conduct in general,
and the police treatment of the informant in par-
ticular, were worse.

Despite our misgivings and reservations, we must affirm.

Affirmed.

MacKENZIE, P.J., concurred.

BEASLEY, J. *(concurring).* The following opinion was promptly circulated as a proposed majority opinion. However, the majority join in an opinion which reaches the same result. Since I am not persuaded by the majority opinion, I submit my opinion, as originally circulated, as a concurring opinion.

Defendant, Basil W. Brown, appeals from an order of the Ingham Circuit Court denying his motion to dismiss on the grounds that he was entrapped and that the evidence was insufficient to support the bindover from the district court to the circuit court.

Defendant, a longtime state senator, was charged with two counts of delivery of marijuana, two counts of delivery of cocaine, one count of possession of cocaine, and one count of possession of marijuana. After preliminary examination, defendant was bound over for trial. In circuit court, defendant moved to quash the information, claiming that he had been entrapped and that there was insufficient evidence of delivery of cocaine and of marijuana. On June 4, 1986, his motion was denied. On August 15, 1986, his application for leave to appeal was denied by this Court. On June 10, 1986, defendant had filed a motion in the circuit court for reconsideration of the June 4, 1986, order. A hearing was held on September 25, 1986, on the motion for rehearing and, on October 20, 1986, an opinion and order were entered in the circuit court denying the motion for reconsideration and holding that defendant had not been

entrapped. On December 16, 1986, in a 2-to-1 decision, this Court denied defendant's application for leave and for a stay of proceedings. Defendant then filed an application for leave to appeal in the Supreme Court. While that application in the Supreme Court was pending, defendant filed a further motion in the circuit court for a stay of proceedings and for a ruling that a search warrant was involved. On January 12, 1987, the circuit judge denied those motions. On January 14, 1987, the Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for consideration as on leave granted, but denied the motion for a stay. 428 Mich 851 (1987). On January 15, 1987, this court stayed the proceedings. We now hear this interlocutory appeal in accordance with the Supreme Court order of January 14, 1987.

The ruling in the circuit court from which defendant appeals was based on the evidence produced at the preliminary examination and at the September 25, 1986, hearing. Defendant did not choose to testify at either of those hearings. The Michigan law is clear[1] that defendant could have testified at the entrapment evidentiary hearing without giving up his right to remain silent at trial on the merits if his entrapment motion failed. Thus, while defendant was, of course, entitled to remain silent, he cannot now on this appeal claim the benefit of any inferences, speculations or presumptions as to what his testimony might have been.

Historically, the United States Supreme Court first recognized and applied the entrapment defense in *Sorrells v United States*.[2] *Sorrells* was a prohibition case where a federal prohibition agent

---

[1] *People v D'Angelo*, 401 Mich 167, 177-179; 257 NW2d 655 (1977).

[2] 287 US 435, 451; 53 S Ct 210; 77 L Ed 413 (1932).

gained the defendant's confidence by deceit and, despite two refusals, on a third try obtained liquor from the defendant for which defendant was then prosecuted. The United States Supreme Court said the entrapment defense prohibits police from instigating a criminal act by persons otherwise innocent in order to lure them to its commission and to punish them.

In 1973, in *United States v Russell*,[3] the United States Supreme Court carefully analyzed the entrapment defense. In that 5-to-4 decision, three opinions were filed. The majority, written by Justice Rehnquist, said:

> Those cases establish that entrapment is a relatively limited defense. It is rooted not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a prescribed offense, who was induced to commit them by the government. [*Russell, supra,* 411 US 435.]

In dissent, Justice Stewart said:

> [T]he defense is not grounded on some unexpressed intent of Congress to exclude from punishment under its statutes those otherwise innocent persons tempted into crime by the Government, but rather on the belief that "the methods employed on behalf of the Government to bring about conviction cannot be countenanced." . . . Thus, the focus of this approach is not on the propensities and predisposition of a specific defendant, but on "whether the police conduct revealed in the particular case falls below [the] standards, to which common feelings respond, for the proper use

---

[3] 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973).

of governmental power." [*Russell, supra,* 411 US 440-441. Citations omitted.]

Later in 1973, the Michigan Supreme Court tackled the entrapment doctrine problems and, in a 4-1-2 decision in *People v Turner,*[4] chose to follow the *Russell* dissent. Justice SWAINSON, indicating an objective test for entrapment was preferable, went on to say that the real concern in entrapment cases is whether, under the particular circumstances, the actions of the police were so reprehensible that the court should refuse as a matter of public policy to permit a conviction to stand.[5]

Since 1973, the Michigan Supreme Court has not altered the basic finding of *Turner* that in Michigan we employ an objective test for entrapment. In *People v D'Angelo,*[6] the Supreme Court said:

> As articulated above, the defense of entrapment in this state does not involve an assessment of guilt or innocence and does not focus upon any susceptibility attributable to the accused. Essentially, a hard analysis of each entrapment case invariably leads to the conclusion that the accused is affirmatively alleging that, even if culpable, he should be insulated from prosecution due to the impropriety of the government conduct. The challenge focuses exclusively upon the nature of the police conduct which, if improper, will not be mitigated, justified or excused in any fashion by the disposition of the accused. As such, it is consistent that the defendant should have the burden of proving by a preponderance of the evidence that he was entrapped.

---

[4] 390 Mich 7; 210 NW2d 336 (1973).

[5] *Id.* at 22. For contrast with recent federal treatment of entrapment claims, see *United States v Harrison Williams,* 705 F2d 603 (CA 2, 1983).

[6] *Supra* at 182.

In *People v Matthews,*[7] we said:

> Michigan has adopted the objective test for en-
> trapment, focusing on whether the actions of the
> police were so reprehensible under the circum-
> stances that public policy will not permit defen-
> dant's conviction to stand. . . . The purpose of the
> entrapment doctrine is to deter unlawful police
> activities and preclude judicial approval of imper-
> missible government conduct. . . . The defendant's
> guilt or innocence is irrelevant. . . . The defen-
> dant has the burden of showing by a preponder-
> ance of the evidence that he was entrapped, and
> the lower court's findings will not be disturbed
> unless clearly erroneous. [Citations omitted.]

None of these cases have involved the use of
sexual favors as part of the entrapment scheme.
However, two Michigan cases have done so. In
*People v Irma Perry,*[8] in a split decision, this Court
affirmed a denial of an entrapment claim, in spite
of the fact that defendant had been engaged to the
police informer, and had known him for over ten
years, that both were in the process of divorces
from marriages subsequent to their earlier engage-
ment, and that he had again proposed marriage to
her. In fact, at the time of the criminal charges on
appeal, defendant and the police informer were
frequenting motels and hotels together. The *Perry*
majority said:

> The issue of whether a long standing, intimate
> relationship, including proposals of marriage, is
> sufficient in itself to constitute an inducement to

[7] 143 Mich App 45, 54; 371 NW2d 887 (1985). See also *People v
Hentkowski,* 154 Mich App 171; 397 NW2d 255 (1986); *People v
Mulkey,* 153 Mich App 737; 396 NW2d 514 (1986); *People v Killian,*
117 Mich App 220; 323 NW2d 660 (1982); *People v Gratzer,* 104 Mich
App 705; 305 NW2d 300 (1981).

[8] 75 Mich App 121; 254 NW2d 810 (1977), lv den 402 Mich 857
(1978).

commit a crime is a difficult question. The police conduct under scrutiny includes the conduct of a paid police informant, . . . a subsequent sale of narcotics may be found to be part of a course of conduct which is the product of prior inducements. . . . However, we do not find the police conduct in the present case to be so reprehensible that the conviction cannot stand. The relationship between the informant and defendant was not created by the police, or by the informant for the purchase. There were no appeals made to defendant's sympathies. The requests which defendant fulfilled seem somewhat routine. The informant's conduct is unnatural but we have great difficulty fitting it into the equation. Such conduct may be reprehensible *ad hominem* but still have no particular police aspect for entrapment purposes. [*Perry, supra* at 125-126. Citations omitted.]

In *People v Wisneski,*[9] in another split decision, where a patient, turned police informer, obtained drugs from her reluctant doctor by performing an act of fellatio on him, this Court said:

Police encouragement of an agent's use of sex to induce one who is unwilling and unready to commit a crime constitutes entrapment. Although the relationship between Phillips and Dr. Wisneski was created independent of any police involvement, . . . it was at the direction of the police that this friendship was "kept alive solely for the purpose of inducing defendant to sell drugs." [*Wisneski, supra* at 304-305. Citation omitted.]

These cases furnish the law that this Court looks to for guidance and applies to the facts of the within case. According to the testimony, this case arose when Nancy Kalder, a special agent for the Organized Crime Unit of the Attorney General's office, was told by an unidentified female

[9] 96 Mich App 299, 304-305; 292 NW2d 196 (1980).

informant that a prostitute by the name of Katherine Roberts had received cocaine and marijuana from defendant.

In a night meeting in a restaurant on October 15, 1985, attended by special agent Kalder, the female informant, and Katherine Roberts, Kalder testified that an understanding was reached that Roberts would go to defendant's apartment, as she stated she normally had in the past, and would receive whatever narcotics he had available. The narcotics would then be brought back to Kalder as a sample and for possible use as evidence. The understanding was that if Roberts did her part of the work, then she would be furnished a place to stay, given some money, and also something would be done to try to get her off drugs and into some type of rehabilitation program. It was also understood that the police would monitor Roberts' phone calls to defendant.

Roberts testified that she had been addicted to heroin since 1983. She said that she had used cocaine since 1979, and also used dilaudids, but was addicted to neither. She testified that she had first earned money as a prostitute in 1980. She said that she had known defendant for around four years, having met him through another prostitute. She said she had been to his apartment fifty to one hundred times as a prostitute. She said that defendant always "shared" his drugs with her. The plain import of Roberts' testimony was that she only went to defendant's apartment in response to his request for the purpose of giving him sexual satisfaction for a consideration and that marijuana and cocaine were used to enhance sexual pleasure. Roberts testified that she and defendant exchanged sex for drugs or cash. The record does not make it clear as to how many times and how much cash defendant paid Roberts for her sexual services.

At the time of her first meeting with special agent Kalder on October 15, 1985, Roberts said she had not been in contact with defendant for thirty days. Presumably, the reason for this was that she had received $130 from defendant for the purpose of buying cocaine for him and had neither done so nor accounted to him for the money. However, there was also testimony that during their four-year relationship there had been other occasions when there were breaks in their meetings for as long as thirty days. However, Kalder gave $50 to Roberts to pay to defendant upon the $130 obligation she had to him. Kalder said she thought that this would ensure Roberts' entry into his apartment. Her feeling was that if she did not do so, defendant might not be willing to resume the sexual relationship with Roberts and, thus, might not permit Roberts to enter his apartment.

Roberts also testified that defendant had not called her "within the last 6 months," apparently because he no longer had a phone number through which he could reach her. Thus, during that period, apparently the only contacts that Roberts had with defendant were initiated by her.

The record indicates that Roberts had three previous convictions for soliciting and, at the time of the preliminary examination, there was a pending soliciting case under the jurisdiction of the Lansing City Attorney's office. It may reasonably be assumed that Roberts was in no position to refuse cooperation with the police.

Roberts testified that, when they first met, defendant told her never to come to his apartment without calling first. Consequently, she always called defendant before going to his apartment, except for a couple of times when she was living with her ex-husband, and he called her; otherwise, all of the telephone calls between Roberts and

defendant were initiated by her. She said that often he would tell her to call back later because he was busy or tired. After her meeting with special agent Kalder, Roberts said she made the telephone calls to defendant to set up meetings with him in the same way that she had for the preceding four years. When Roberts told Kalder that she often gave defendant sex in exchange for drugs, Kalder told Roberts to try to "avoid it." Nevertheless, during her visits to defendant, which were suggested and monitored by the investigators, Roberts did have oral sex with defendant.

The investigators kept their share of the bargain by enrolling Roberts in a rehabilitation program and finding a place for her to stay. Also, they paid for a motel room for her, paid various food, clothing and medical expenses, and their personnel drove her to a methadone clinic every day. She said that the investigators did everything that they had promised to do.

On October 17, 1985, special agent Kalder had Roberts call defendant and tell him that she had $50 to give to him for the money that she had stolen from him and offer to come to his apartment. Before she went to defendant's apartment, she was strip searched by the investigator to make sure that no drugs were taken into defendant's apartment, and strip searched again on return to ensure the investigators that she had not taken any drugs out of defendant's apartment other than those that she handed over to Kalder. She testified that when she entered defendant's apartment, he asked her if she wanted to roll them a joint, and that the marijuana was in defendant's bedroom in a dish. She rolled the joint and both of them smoked it. She and defendant also used some cocaine that defendant had in his apartment. She injected the cocaine with a syringe and went into

the bathroom to do so, because defendant "didn't like to watch anybody stick a needle in their arm in front of him." When she left, defendant gave her a small butt of marijuana to take with her to smoke at home. She gave that marijuana to Kalder.

A second visit to defendant's apartment was arranged for October 29, 1985. Roberts was again strip searched before entering defendant's apartment. Defendant asked her if she wanted some cocaine and she agreed. Defendant gave her cocaine to take into the bathroom to inject and she injected some, but put the rest into her purse. She stated that she did not steal the cocaine, but that defendant had given it to her.

Kalder testified that on October 28, 1985, she and Roberts went to defendant's apartment. She said Roberts was permitted to enter, but not her.[10] A third trip to defendant's apartment was ar-

---

[10] [Examination by Assistant Prosecutor]

Q. Did you ever go with Kathy Roberts to Senator Brown's apartment?
A. Yes.
Q. When was that?
A. On October 28th. . . .
Q. Where were you—why is it that you heard him, but didn't see him?
A. He slammed the door when we—when we got there.
Q. Okay. Did you recognize his voice—that voice as being that of Senator Brown?
A. Yes. . . .

[Cross examination by defense counsel]

Q. Okay. And, when the door was slammed, she was denied admittance to his apartment, isn't that correct?
A. She was able to get in.
Q. Huh?
A. She was able to get in. . . .

[Redirect examination by Assistant Prosecutor]

ranged for November 7, 1985. As before, Roberts was strip searched before entering the apartment. She said that defendant was smoking when she arrived and asked her if she wanted to roll them a joint. She rolled one out of some marijuana that was on defendant's dresser and they both smoked it. She testified that she and defendant also used some cocaine on that November 7, 1985, visit. She said that defendant had a large package of cocaine that he poured out onto a mirror. Defendant snorted the cocaine and she went into the bathroom about three times to inject it. Also, she put some of the cocaine that defendant had given her into an envelope in her purse and carried it out with her when she left. She gave the envelope to special agent Kalder.

Roberts claimed that all but one of the telephone calls that she made to defendant after October 15, 1985, were monitored by the agents. Kalder had told her not to call defendant without an agent being present. She said that, on those calls, defendant never told her either that he never wanted to see her again or that he never wanted to hear from her again.

Testimony indicated that Roberts took a syringe with her to defendant's apartment on at least one occasion. Kalder testified that she may have permitted Roberts to take a syringe onto the premises. This was obviously at variance with the police undertaking to help Roberts get off drugs.

In this case, defendant urges that this Court to look at the totality of actions on the part of the

*Q.* Do I understand, then, that you were—that Kathryn Roberts was allowed into Senator Brown's apartment, but you were not?

*A.* That's correct. He hadn't been expecting me, and apparently didn't want to see me.

police and asserts that nine central facts indicate overzealous and reprehensible conduct on the part of the police so as to constitute entrapment of defendant. First, defendant says that the police initiated Roberts' contact with defendant and engaged her to work for them in gaining entrance to defendant's apartment for the purpose of obtaining narcotics. Second, the police had no knowledge that defendant had at any time engaged in trafficking of drugs. Third, the police induced Roberts to renew her acquaintance with defendant to gain entrance into his apartment. Fourth, the police obtained a search warrant solely for the purpose of monitoring telephone calls to be made at their request by Roberts for the purpose of entering defendant's apartment. Fifth, Roberts was permitted on two occasions by the police to take a syringe with her so that she could inject herself with cocaine, even though the police had promised her assistance in getting off drugs. Sixth, Roberts exchanged sexual favors for drugs on each occasion that she went to defendant's apartment under police aegis. Seventh, Roberts admitted that it was the police and not her who wished her to renew her relationship with defendant. Eighth, the police gave Roberts $50 to make certain that she would be permitted to enter defendant's premises. Ninth, Roberts was given money, food, and a place to stay for her assistance to the police.

Regarding these so-called central facts, it is true that the police engaged Roberts for the purpose of attempting to gain entrance into defendant's apartment to obtain evidence of narcotics violations. The record is not clear as to what other knowledge, if any, the police had with respect to defendant's drug associations or dealings. While the police promoted the immediate arrangement for renewing Roberts' relationship with defendant,

the fact is that, as a prostitute, she had performed sexual services for defendant for a period of around four years. Thus, it is a close question whether the police induced renewal or whether the sexual relationship between Roberts and defendant was such that they were merely continuing that which had for some time existed. It is true that the police obtained a search warrant for monitoring telephone calls. While it is true that on two occasions Roberts took a syringe with her to defendant's apartment so that she could inject herself with cocaine, the police say that they understood this was continuing a practice that had existed for several years. It is true that each time Roberts went to defendant's apartment at the suggestion of the police, she gave sex in exchange for sharing drugs. It is true that Roberts testified that it was the police and not her who suggested renewal of her relationship with defendant. It is also true that $50 was given to Roberts by the police to ensure her entrance into defendant's apartment. Also, it is true that she was given money, food and a place to stay as compensation for her assistance to the police. Thus, on these facts, the question is squarely presented as to whether, under Michigan law, these actions constitute such reprehensible conduct on the part of the police as to constitute entrapment.

The prosecutor says that this case is different from *Wisneski, supra,* where defendant at first refused the informant's request for an illegal prescription and where the testimony revealed a very unwilling defendant. The prosecutor says that in *Wisneski* the sexual activity was specifically used to induce an unwilling and unready defendant to commit the unlawful delivery of narcotics. The prosecutor says that in this case there was no evidence that defendant was unwilling to share

drugs with Roberts or that she used sex to coerce or induce an unwilling defendant to provide her with drugs. The prosecutor says that, when Roberts engaged in sex with defendant in his apartment and shared drugs with him during the sexual action, defendant and Roberts were simply doing the same thing that they had done between fifty and one hundred times over a period of four years. The prosecutor says there is no evidence that defendant ever told Roberts that he did not want to continue to see her or hear from her, and that the only time that he said "no" to Roberts' coming over was when he did not have any drugs. The prosecutor says this case is more like *Perry, supra,* where no appeals were made to the defendant's sympathies, and the requests which the defendant fulfilled seemed "somewhat routine." The prosecutor also says that under *People v Crawford,*[11] the question is not whether it was "reprehensible" for Roberts to carry her own syringe into defendant's apartment, but rather whether this activity "induced or instigated the crime" in question.

In denying defendant's entrapment motion, the trial judge filed two opinions and orders. In the June 4, 1986, opinion and order, he said that, since defendant chose to rely on the transcript of the preliminary examination, he would assume that, for purposes of the motion, Roberts testified truthfully. He then reviewed the testimony, commented on the cases he believed were applicable and concluded that defendant had not been entrapped.

For purposes of appellate review, this Court looks to whether defendant has proved entrapment by a preponderance of the evidence. The defendant has the burden of proof. The Court of Appeals does not reverse the trial court unless its concludes

---

[11] 143 Mich App 348, 353; 372 NW2d 550 (1985), lv gtd on other grounds 424 Mich 879 (1986).

that the trial court's finding was clearly erroneous. In applying Michigan's objective test for entrapment, this Court decides whether there was reprehensible police action of an impermissible level. Unfortunately, the Michigan standard is not susceptible of precise definition. Rather, this Court is required to go from case to case where entrapment is asserted and decide, based upon the totality of the circumstances, whether there is reprehensible, impermissible governmental (police) conduct. The within case cannot be said to be squarely controlled by either *Perry* or *Wisneski.*

In this case, the police were faced with an indication of possible serious cocaine use and delivery by a high public official, but, since the evidence came from a prostitute who was also a heroin addict, there was obviously an insufficient basis for a criminal warrant. The investigator here said that part of her reason for the course of action followed was to determine whether the evidence was reliable. Hence, there was a basis to investigate further.

Was it reprehensible in the entrapment context to use a prostitute to attempt to secure evidence of drug violations? While, for many, it is distasteful that the police would find it necessary to use an admitted prostitute as a police agent-informer and, while I do not condone prostitution as a way of earning a living, I am not prepared to hold that, standing alone, the fact of using a prostitute as a police agent is reprehensible. The police had a witness who purported to have shared cocaine with defendant many times over a long period, but who happened to be a prostitute.

Faced with the fact that the prostitute had not had any dealings, sexual, drug or otherwise, with defendant in thirty days, and the fact that the prostitute had taken $130 from defendant, the

police gave the prostitute $50 for use in repaying defendant. The police say their purpose was to be sure the prostitute could gain entrance to defendant's apartment. This concrete act is evidence that the police, albeit indirectly, instigated the action, or at least this was one factor in triggering what was to follow.

Questioned by the prostitute, the police investigator told her to avoid sex with defendant if she could. In spite of the police advice, it was, of course, obvious that paid sex was to occur between defendant and Roberts. From defendant's standpoint, the reason for permitting Roberts to enter was sex, not drugs. On one, or possibly two, of the planned meetings in defendant's apartment, Roberts carried a syringe which everbody knew was drug paraphernalia to inject cocaine. The police investigator was aware that Roberts carried the syringe into defendant's apartment, but made no objection. The police answer is that Roberts was using cocaine in the same way she always had by injecting it into her vein. Apparently, the intended assumption is that, if she had been denied the syringe, she would have snorted the cocaine and that, in any event, the police were doing no more than going along with an established, although unlawful, practice.

What conclusions can be drawn in this case? It is not a typical entrapment case. Usually, a defendant who claims to have been entrapped testifies in support of his claim. In fact, he is encouraged to do so by permitting him to assert his Fifth Amendment right to remain silent[12] at trial on the merits in spite of having testified at the entrapment hearing. Here, I can understand defendant's reluctance to testify at the entrapment hearing. As a

---

[12] US Const, Am V.

well-known political figure, testifying and being cross-examined at the entrapment hearing would likely have placed him on trial in the media. But, not testifying would seem to have weakened his position regarding his entrapment claim.[13]

For example, there is no testimony contradicting Roberts' description of her long commercial, sexual relationship with defendant. Neither is there any contradiction of the testimony regarding Roberts' sharing of cocaine with defendant and her long-time method of injecting cocaine with a syringe. If these practices had gone on over a period of four years, I would not believe it could fairly be said that the police "instigated" them. Neither would permitting Roberts as a police agent to take a syringe into defendant's apartment while on a police-arranged visit be so reprehensible as to constitute impermissible police action. Neither would furnishing Roberts with $50 to pay defendant to resume or restart their sex-drug relationship be so outrageously reprehensible as to require a finding of entrapment.

Thus, while defendant had no obligation to testify at the entrapment evidentiary hearing, by not doing so he left Roberts' testimony regarding their relationship uncontradicted. While this Court does not look to guilt or innocence, or predisposition to commit the crime, on evidentiary hearings under Michigan's objective test for entrapment, these facts going to a history of an ongoing sex and drug relationship between Roberts and defendant were relevant to the question whether the police instigated the criminal acts imputed to defendant. In addition, the question whether there was reprehensible police conduct in this case must be viewed in the context of what the police reasonably be-

---

[13] Depending, of course, on what his testimony would have been.

lieved was the relationship between Roberts and defendant.

It should also be remembered that, for purposes of ruling on entrapment, this Court looks to police conduct. The policing of the cocaine traffic is an extremely difficult and arduous task for law enforcement officials. The terrible effects of cocaine addiction on our society are too well known to require proof here. I take judicial notice of the necessity to stamp out the spiraling increase in cocaine use. Maybe it is sometimes necessary to permit the police to take measures to ferret it out that would not be appropriate for Sunday school teachers.

In this case, I decline to find that the police conduct was sufficiently reprehensible to require a finding that defendant was entrapped. Defendant has not met his burden of proof. Accordingly, the order of the trial court denying the entrapment motion must be affirmed.

Defendant also claims that there was not sufficient evidence offered at the preliminary examination to support the bindover on charges of delivery of cocaine and marijuana. The basis for defendant's claim in this regard is the assertion that there was not any evidence of a "transfer" or "handing over" of cocaine by defendant. He says that the evidence, even when viewed in a light most favorable to the prosecution, shows, at most, a voluntary sharing of cocaine. He concludes that the Legislature "could not have intended" that drug users who pass around or share drugs "in a completely social manner" would be subject to long prison terms.

MCL 333.7105(1); MSA 14.15(7105)(1) defines "delivery" as "the actual, constructive, or attempted transfer from 1 person to another of a

controlled substance, whether or not there is an agency relationship." I believe that, for purposes of application in this case, the meaning of § 7105 is plain and unambiguous and is not open to defendant's interpretation that would exclude its application with respect to "sharing" of controlled substances in social situations.

In this case, the testimony at the preliminary examination, if believed, shows that the prostitute, Katherine Roberts, obtained cocaine from defendant on October 29, 1985, and on November 7, 1985. As a matter of fact, although perhaps secondary to the cocaine charge, there was also testimony at the preliminary examination that Roberts also obtained marijuana from defendant.

In his brief, defendant cites *People v Williams*,[14] a marijuana case. We do not interpret *Williams* to require that the cocaine be physically "handed over" to the transferee. Neither do we interpret another marijuana case cited by defendant, *People v Edwards*,[15] to mean that *only* a physical handing over constitutes delivery. In the within case, the cocaine and marijuana were defendant's, not the prostitute's. The cocaine and marijuana were in defendant's apartment. When defendant asked Roberts if she wanted "to do some cocaine with him," when she said "yes," and when he gave her cocaine that she injected into herself, the statutory definition of delivery was met.

Whether that is what happened, and the nature of their sharing of cocaine and marijuana, are questions of fact for determination at trial. I am satisfied that there was enough evidence at the preliminary examination to support a valid bindover to the circuit court for trial.

[14] 54 Mich App 448; 221 NW2d 204 (1974).

[15] 107 Mich App 767; 309 NW2d 607 (1981).