PEOPLE v SCHULTZ

Docket No. 216299. Submitted December 7, 2000, at Detroit. Decided July 20, 2001, at 9:00 A.M.

Kimberly A. Schultz was convicted by a jury in the Oakland Circuit Court, Deborah G. Tyner, J., of delivering less than fifty grams of heroin to her boyfriend, who died from intoxication caused by alcohol and injected heroin. The defendant appealed.

The Court of Appeals *held*:

1. The trial court did not err in denying the defendant's motion for a directed verdict of acquittal based on her assertion that there was insufficient evidence of delivery. The controlled substances act defines "delivery" to mean the actual, constructive, or attempted transfer from one person to another of a controlled substance. Although the controlled substances act does not define "transfer," dictionary definitions of the term broadly contemplate any conveyance of an asset or property from one person to another. Viewing the evidence presented by the prosecution up to the time of the motion for a directed verdict of acquittal in the light most favorable to the prosecution, a rational trier of fact could have found that the defendant supplied the decedent with heroin that belonged to her, not heroin that she and the decedent jointly purchased for their use. Despite the defendant's claim that she could not have delivered heroin to the decedent because she and the decedent were joint, simultaneous purchasers and possessors of the heroin, the jury could have inferred from evidence that indicated that the decedent was not a drug user, in contrast to the defendant, who, by her own admission, was a drug user, that the heroin belonged to the defendant and that she delivered it to the decedent.

2. The defendant's claim of prosecutorial misconduct with regard comments made by the prosecutor during closing arguments lacks merit. The prosecutor did not impermissibly argue that the defendant could be guilty of the uncharged crime of murder because she might have wanted to kill the decedent after he told others of his desire that the defendant vacate his apartment, and did not suggest that the jurors should speculate regarding what transpired if they did not believe the defendant's version of the events surrounding the decedent's death. Rather, the prosecutor simply and properly

emphasized the unlikelihood of the defendant's assertions that the decedent consented to using heroin and had a history of heroin use by recounting the evidence tending to establish the decedent's distaste for drugs and the defendant's drug habit, and argued that the defendant was not worthy of belief.

Affirmed.

1. CONTROLLED SUBSTANCES — DELIVERY.

Delivery of a controlled substance is the actual, constructive, or attempted transfer or conveyance of the controlled substance from one person to another (MCL 333.7105[1]).

2. PROSECUTING ATTORNEYS — PROSECUTORIAL MISCONDUCT — ARGUMENTS TO JURIES — APPEAL.

A defendant who fails to object at trial to improper argument by the prosecutor to the jury and then seeks to avoid forfeiture of the issue on appeal must establish that error occurred, that the error was clear or obvious, and that the error affected the outcome of the trial.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David Gorcyca*, Prosecuting Attorney, and *Thomas Richards*, Assistant Prosecuting Attorney, for the people.

*John D. Lazar*, for the defendant on appeal.

Before: SAWYER, P.J., and JANSEN and GAGE, JJ.

GAGE, J. Following a jury trial, defendant was convicted of delivering less than fifty grams of heroin, MCL 333.7401(2)(a)(iv). The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to one year in jail and lifetime probation. Defendant appeals as of right. We affirm.

I

Early on October 2, 1997, defendant Kimberly A. Schultz summoned a neighbor for help. Defendant's boyfriend, Steven Schultz, was unconscious, lying on his

back on the living room floor. Because the boyfriend had no heartbeat and was not breathing, defendant called 911 and the neighbor performed cardiopulmonary resuscitation until emergency workers arrived. Shortly thereafter, several police officers and firefighters arrived at the apartment, but could not successfully revive defendant's boyfriend (hereinafter the decedent).[1] The Oakland County Deputy Medical Examiner autopsied the decedent and concluded that he died from a combination of alcohol[2] and morphine[3] intoxication. The examiner detected on the decedent's upper left arm a fresh needle mark, but noticed no further markings indicating past drug use by the decedent. The Oakland County Medical Examiner's chief toxicologist opined on the basis of the decedent's blood test results that his death occurred within minutes of the moment the heroin was injected.

To the police who arrived at the decedent's apartment on the morning of the decedent's death, defendant claimed that during the previous evening she was at a bar until 1:30 A.M. and when she returned home she found the decedent unconscious on the floor and his former girlfriend leaving the apartment. Leslie Brock, who was a friend of defendant and who had occupied the apartment directly above the dece-

---

[1] The police also searched the apartment and seized some used, bent syringes, an unused syringe, some bloody gauze, and some spoons with gauze stuck to them.

[2] The boyfriend had a 0.36 percent blood alcohol level.

[3] The examiner explained that in the body heroin broke down into morphine and six monoacetylmorphine. The boyfriend's blood contained 115 nanograms per milliliter of morphine, and fifty-three nanograms per milliliter of six monoacetylmorphine. According to the examiner, any amount of morphine beyond fifty nanograms per milliliter could be lethal.

dent's apartment for approximately five months before his death, testified that she never observed the decedent use heroin, only alcohol, but witnessed defendant inject heroin every day. According to Brock, the decedent disliked that defendant used heroin, expressing that her drug use "was a big problem." Brock recalled that she encountered defendant near the decedent's apartment later on the morning of the decedent's death. Brock testified that defendant, who appeared hysterical, stated that the decedent was dead, and that defendant, in response to Brock's question about what had transpired, stated that "she [defendant] shot him up with a hit." The prosecutor also presented several other witnesses who testified that the decedent had an alcohol addiction, but disliked and never used drugs. Detective Sergeant Thomas Cleyman of the Hazel Park Police Department testified regarding several statements he took from defendant during the afternoon following the decedent's death. Defendant acknowledged to Cleyman her past use of heroin, and that she had broken a promise to the decedent to stop using heroin. Cleyman eventually elicited from defendant four different versions of the events surrounding the decedent's death. Initially, defendant denied knowing whether the police might find heroin in the decedent's blood because she did not spend the entire evening with him. She and the decedent began drinking outside an apartment of some friends of the decedent. She and the decedent then went to Sugarbaker's bar until 10:30 P.M., when defendant dropped the decedent off at his apartment because of his advanced state of drunkenness. Defendant then went to another bar. On returning to the apartment in the early morning

hours, defendant observed another woman leaving the apartment and that the decedent had turned blue. Defendant next claimed that she had dropped off the decedent, who was very drunk, at the apartment and returned to a bar, and speculated that the decedent might have ridden his bicycle to Detroit to obtain heroin for himself. Defendant subsequently indicated that she and the decedent bought some heroin together, and returned to the apartment where they separately injected it. Cleyman testified that defendant's last version of events went as follows:

> The last one is she stated that she did the works, she admitted that she mixed the Heroin, she said she was selfish she took most of it. . . . [Defendant] told [the decedent] that she would do the works, but she wanted the first hit. She told officer [sic] that is how she knew he did the Heroin and once again I disagreed with her because she still stated that she went into the bathroom to shoot up and that she possibly still could not have known if he shot up or not because she stated she wasn't in the room with him.

In response to Cleyman's inquiry about how the decedent knew how to shoot himself up, defendant replied that during the 1970s the decedent previously had injected heroin, and that the decedent injected heroin three times during September 1997. Defendant signed a written statement matching the last version of her story and including the observation that "God showed me the dangers of what [heroin] will do and I know that I could be next. I can't bring him back and the Lord knows I'm only asking for death myself." After the interview, defendant marked on a truth/lie chart that Cleyman prepared that she had been ninety-seven percent truthful. More than two months later,

Cleyman arrested defendant,[4] which precipitated further statements by defendant the following day. Cleyman read aloud defendant's final written statement, which described the following:

> Steven J. Schultz and I were out October 1, 1997, drinking. The second bar we approached wouldn't serve us. Steven and I were in the area to buy Heroin and he suggested we get high. I said no, let's just go home. We went anyhow, got home, we both did each other. I can't remember much, who went first, but I do remember fighting over the drug. We seem to fight over alcohol and Heroin as Steven wanted his way and his way only.
>
> I always and/or in most cases gave it to him. We did each other. I noticed ten minutes or so later something seemed strange so I try when I fixed the syringe, the dose, I put in there was just water. I thought I had most of or all of it, still not knowing if Steven had more of his own. I only meant for us to get our life in order, his death intentional [sic].

Defendant informed Cleyman that the decedent purchased the heroin with money from the paycheck he had collected earlier that afternoon. Defendant further explained orally that she injected heroin into the decedent's left arm, after which the decedent fell unconscious, and that the decedent's death was not intended. According to Cleyman, defendant also "stated that she knew it was dangerous, the Heroin" "[b]ecause she had fallen out. She said she had never witnessed anyone falling out before, but she stated she had fallen out herself, personally."[5]

Defendant stood trial on charges of involuntary manslaughter and delivering less than fifty grams of

---

[4] Cleyman testified that when he arrested defendant, he recovered six hypodermic needles from her jacket pocket.

[5] Cleyman explained that "to fall out" meant to overdose.

heroin. At the close of the prosecutor's case, defendant moved for a directed verdict regarding the delivery count,[6] arguing that the delivery charge must fail because the evidence indicated that the decedent purchased the heroin, and defendant could not transfer to him something that he already owned. The prosecutor responded that defendant's injection of heroin into the decedent's arm fell within the clear statutory definition of delivery as a transfer. The trial court denied defendant's motion on the bases that (a) social sharing of drugs constitutes delivery under the controlled substance statutes, citing *People v Brown*, 163 Mich App 273; 413 NW2d 766 (1987); (b) although evidence showed that the decedent purchased the heroin, "[t]he law does not recognize an ownership concept for illegal substances"; (c) because both defendant and the decedent had access to the heroin "[y]ou could make the argument . . . that [defendant] delivered a portion of her share to him"; and (d) "the social policy behind the delivery statute is to discourage the flow of illegal substances between individuals in our society and the social policy is better promoted by allowing the charge to go forward in this factual scenario." The jury found defendant not guilty of involuntary manslaughter, but guilty of delivering heroin.

II

Defendant contends that the trial court erred in denying her motion for a directed verdict regarding the charge of delivery of heroin because the evidence,

---

[6] Defendant also moved for a directed verdict with respect to the involuntary manslaughter charge, which the trial court denied.

which established that she and the decedent jointly purchased and then shared heroin, was insufficient to establish a delivery of heroin. In ruling on a motion for a directed verdict, the trial court must consider in the light most favorable to the prosecutor the evidence presented by the prosecutor up to the time the motion is made and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Vincent*, 455 Mich 110, 121; 565 NW2d 629 (1997). Circumstantial evidence and reasonable inferences arising therefrom can sufficiently establish the elements of a crime. *People v Jolly*, 442 Mich 458, 466; 502 NW2d 177 (1993). "However, it is not permissible for a trial court to determine the credibility of witnesses in deciding a motion for directed verdict of acquittal, no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). This Court applies the same standards in reviewing the trial court's ruling on a motion for a directed verdict. *People v Daniels*, 192 Mich App 658, 665; 482 NW2d 176 (1992).

Our resolution of the issue whether defendant's conduct, as reflected within the trial court record, qualifies as a delivery of a controlled substance also involves statutory interpretation. Statutory interpretation is a question of law that we review de novo. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998).

> The rules of statutory construction are well established. The fundamental task of statutory construction is to discover and give effect to the intent of the Legislature. The task of discerning our Legislature's intent begins by examining the language of the statute itself. Where the language of the statute is unambiguous, the plain meaning reflects the

> Legislature's intent and this Court applies the statute as written. Judicial construction under such circumstances is not permitted. [*People v Borchard-Ruhland*, 460 Mich 278, 284; 597 NW2d 1 (1999) (citation omitted).]

Where a statute supplies its own glossary, courts may not import any other interpretation but must apply the meaning of the terms as expressly defined. *Harder v Harder*, 176 Mich App 589, 591; 440 NW2d 53 (1989). This Court may consult dictionaries to discern the meaning of statutorily undefined terms. *People v Stone*, 463 Mich 558, 563; 621 NW2d 702 (2001).

The jury found defendant guilty of violating MCL 333.7401(2)(a)(iv), which in relevant part provides that one may not "deliver a controlled substance" "in an amount less than fifty grams." "Deliver" is further defined as follows:

> "Deliver" or "delivery" means the actual, constructive, or attempted transfer from 1 person to another of a controlled substance, whether or not there is an agency relationship. [MCL 333.7105(1).]

"[*T*]*ransfer* is the element which distinguishes delivery from possession." *People v Steele*, 429 Mich 13, 25-26; 412 NW2d 206 (1987) (emphasis in original).

The Legislature did not provide a specific, statutory definition of "transfer." Dictionary definitions of "transfer," both as a noun and as a verb, seem to broadly contemplate any conveyance of something from one person to another.

> *n.* 1. Any mode of disposing of or parting with an asset or an interest in an asset . . . . The term embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with prop-

erty or with an interest in property . . . . 3. A conveyance of property or title from one person to another.

\*      \*      \*

*vb.* 1. To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of. 2. To sell or give. [Black's Law Dictionary (7th ed), pp 1503-1504.]

This Court has concluded that the scope of prohibited transfers, as contemplated by MCL 333.7105(1), plainly and unambiguously includes " 'sharing' of controlled substances in social situations." *Brown, supra* at 275 (QUINNELL, J.), 296-297 (BEASLEY, J., concurring). "The cases are well settled that the act of transferring a controlled substance is sufficient to sustain a finding of an actual delivery." *People v Maleski*, 220 Mich App 518, 522; 560 NW2d 71 (1996).

Defendant relies on *United States v Swiderski*, 548 F2d 445 (CA 2, 1977) to support her contention that the sharing of drugs between two individuals who jointly acquired them does not qualify as a delivery of controlled substances. In *Swiderski*, "[a]ccording to the version of facts most favorable to the government," the two defendants, an engaged couple, together purchased approximately one-quarter pound of cocaine. *Id.* at 447-448. Both defendants were present during the sale, and both sampled the cocaine before the sale. *Id.* at 448. Defendant Swiderski's fiancée "remarked that the quality of the cocaine was not good enough for their personal use, but that they had a buyer who would take it," and Swiderski paid the seller for the cocaine, which police seized from Swiderski's fiancée shortly after the transaction. *Id.* After

a jury trial, the defendants were convicted of possession with intent to distribute cocaine. *Id.* at 449.

The defendants on appeal challenged the trial court's supplemental instruction to the jury concerning the legal meaning of intent to distribute, which instruction "made it clear over defense objections that distribution could be satisfied solely by a transfer between Swiderski and De Los Santos [his fiancée]." *Id.* After noting that under the relevant provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970[7] the term "distribute" signified "to deliver," which in turn meant "the actual, constructive, or attempted transfer of a controlled substance, whether or not there exists an agency relationship," the Second Circuit Court of Appeals framed the precise issue before it as "whether a statutory 'transfer' may occur between two individuals in joint possession of a controlled substance simultaneously acquired for their own use." *Id.* The court observed that the act sharply distinguished "between drug offenses of a commercial nature and illicit personal use of controlled substances," *id.*, reflecting Congress' intent to punish more severely drug distribution and trafficking activities that "tend[] to have the dangerous, unwanted effect of drawing additional participants into the web of drug abuse." *Id.* at 450. The Second Circuit Court of Appeals found the facts before it outside the scope of conduct that Congress intended to punish more severely:

---

[7] The Michigan Supreme Court noted that "[t]he Federal act was the first major overhaul of drug laws to occur in 20 years. It provided the impetus for the adoption of the Uniform Controlled Substances Act in some form by 45 jurisdictions including Michigan." *People v Alford*, 405 Mich 570, 586, n 6; 275 NW2d 484 (1979).

[W]here two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse—simple joint possession, without any intent to distribute the drug further. Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution.

*          *          *

. . . Whatever else may be embraced within the term "transfer," a term that is not defined in the Act, we are persuaded that it was not intended to include the exchange of physical possession between two persons who jointly acquired and hold the drug for their own use. [*Id.*]

The Second Circuit Court of Appeals expressly limited its holding "to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." *Id.* at 450-451.

While *Swiderski* persuasively supports defendant's argument that one joint, simultaneous purchaser and possessor of heroin cannot be guilty of delivery for giving some quantity of the heroin to the other joint, simultaneous purchaser and possessor, the facts of this case appear distinguishable from those underlying *Swiderski*. Defendant averred in her statements to police that she and the decedent jointly purchased the lethal quantity of heroin for their own personal use, but other evidence presented during trial suggested otherwise, specifically that defendant might have shared with the decedent heroin that she already possessed. Defendant acknowledged to the police that she was a heroin user, and a witness observed defendant inject herself with heroin daily. The testimony of several witnesses agreed that the

decedent did not take drugs because of a distaste for them, and decedent's autopsy revealed no physical signs of regular drug use. Defendant reportedly acknowledged to Cleyman her knowledge that the heroin she injected into the decedent was dangerous, apparently because it had caused defendant herself to lose consciousness.

Viewing these facts and the reasonable inferences arising therefrom in the light most favorable to the prosecution, we find that they support a rational jury's inference that defendant supplied the decedent with an amount of heroin that she already possessed, and that the decedent played no role in obtaining the heroin. *Vincent, supra; Jolly, supra.* It remained for the jury to determine whether to credit defendant's version of the heroin purchase, or to accept the prosecution witnesses' statements regarding the decedent's negative view of and abstinence from drugs and make the further rational inference that defendant supplied heroin to the decedent. *Mehall, supra.*

Because the evidence supported the reasonable inference that defendant shared with the decedent heroin that she previously acquired, *Swiderski* does not control the outcome of this case. See *People v Lytal,* 96 Mich App 140, 163; 292 NW2d 498 (1980) (distinguishing *Swiderski* because "[h]ere, defendant [charged with possession with intent to deliver] and his accomplice . . . did not simultaneously acquire possession of the narcotics at the outset"), rev'd on other grounds 415 Mich 603; 329 NW2d 738 (1982). We note that most cases considering whether to apply *Swiderski* decline because of factual distinctions. See *United States v Washington,* 41 F3d 917, 920, n 2 (CA 4, 1994) (distinguishing *Swiderski* because the defen-

dant bought cocaine himself planning to share it with friends, and noting that "[n]o other circuit has followed the Second Circuit in *Swiderski*"); *United States v Speer*, 30 F3d 605, 608, 609 (CA 5, 1994) (distinguishing *Swiderski* because of undisputed facts that the defendants who jointly acquired cocaine intended to distribute some of it to an individual "who was not at or near the scene of the transaction," and observing that "[t]his Circuit has never adopted the *Swiderski* doctrine nor have we found that any other circuit has done so"); *United States v Rush*, 738 F2d 497, 514 (CA 1, 1984) ("The *Swiderski* holding appears fully justified on the facts of that case, but we hesitate to approve its casual extension to situations where more than a couple of defendants and a small quantity of drugs are involved . . . ."). While we find no flaw in *Swiderski*'s analysis given its facts, we likewise find circumstances distinguishing the instant case from *Swiderski*.

We conclude that the trial court properly denied defendant's motion for a directed verdict regarding the delivery charge because the evidence tending to establish defendant's social sharing of the cocaine with the decedent fell within the plain, broad scope of a "transfer" within MCL 333.7105(1). *Brown, supra.* The Supreme Court has recognized that "delivery is a significantly more serious offense than mere possession," as "reflected in the Legislature's enactment of separate sections governing possession and delivery." *People v Fluker*, 442 Mich 891, 892 (1993). The Legislature clearly intended to deter drug trafficking by strictly punishing drug dealers. *People v Fields*, 448 Mich 58, 64-65; 528 NW2d 176 (1995). While according to defendant's proffered version of events involving

her and the decedent's joint, simultaneous acquisition of heroin and their sharing of the drug solely between themselves defendant would appear to fall outside the category of drug traffickers the Legislature aimed to sanction more severely, the record supports the jury's reasonable finding to the contrary that in injecting the decedent with her previously acquired heroin defendant fatally drew the unfortunate decedent "into the web of drug abuse." *Swiderski, supra* at 450. Had the Legislature wished to authorize for social sharers of controlled substances, like defendant, lesser punishments than those applicable to commercial drug traffickers, it could have done so explicitly. To the contrary, it employed the broad term "transfer" to define the culpable element of delivery. The plain language of MCL 333.7105(1) would encompass defendant's act of sharing her supply of cocaine with the decedent. *Borchard-Ruhland, supra; Brown, supra.*

III

Defendant also argues that the prosecutor made improper closing arguments that denied her a fair trial. Because defendant did not timely or specifically object to the now challenged statements by the prosecutor, we will review defendant's allegations of improper conduct by the prosecutor only for plain error. *People v Schutte*, 240 Mich App 713, 720; 613 NW2d 370 (2000). To avoid forfeiture of her unpreserved claims of prosecutorial misconduct, defendant must establish that errors occurred, these errors were clear or obvious, and the errors affected the outcome of the trial court proceedings. *People v Wyngaard*, 462 Mich 659, 668; 614 NW2d 143 (2000).

In reviewing alleged prosecutorial misconduct, we review the pertinent portion of the record and evaluate the prosecutor's remarks in context. Prosecutors cannot make statements of fact unsupported by the evidence, but remain free to argue the evidence and all reasonable inferences arising from it as they relate to the theory of the case. The prosecutor's comments must be considered as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. *Schutte, supra* at 721.

Defendant asserts that the prosecutor impermissibly (1) argued that defendant could be guilty of the uncharged crime of murder because she might have wanted to kill the decedent, whom the record indicated planned to request that she vacate the apartment she shared with him, and (2) suggested that the jurors should speculate regarding what transpired if they did not believe defendant's asserted version of the events surrounding the decedent's death. The record reflects the following relevant statements by the prosecutor during his closing statement:

> The only reason that it's really any kind of an issue at all in this trial [whether the decedent consented to being injected with heroin] is because it's a little bit disconcerting that a man who has no evidence on his body of prior of [sic] old drug use, as you heard from the medical examiner's office, a man who is known to his friends to be a drinker, heavy drinker, but known to be against drugs. And you know [sic] only heard that from his buddy, Terry Fletcher, his employer, you heard from Leslie Brock, this defendant's friend, not [the decedent's] friend, this defendant's friend when asked about [the decedent's] prior Heroin use, no, he was dead set against that.

You have a man who has no marks on his body of prior drug use, the man who's known to be adamant against it. A man, who the very afternoon, prior to his death told his employer that he was going to kick her out of her house and then he goes out and does Heroin that night. It's a little bit disconcerting. It doesn't bear upon the law in this case, but it is a little bit disturbing.

## The prosecutor in his rebuttal closing continued as follows:

So, the hypothetical that [defense counsel] presented to you takes everything out of context in terms of the issues that you have to look at. Counsel also told you what [sic] [the decedent] chose to participate in Heroin. Well, you know what we don't know that. Once again I presented it to you earlier, we don't even know if this man was conscious. I can't tell you he wasn't. I can't tell you he didn't want Heroin that night. I can tell you it certainly is unusual that a man who's been drinking that long, that he can build up that kind of tolerance to alcohol when on this occasion even though he's drunk decides he wanted Heroin despite the fact that hours earlier he told his employer he was going to kick her out.

Despite the fact that her own Heroin buddy, Leslie Brock told you, oh no, he was dead set against that. We don't know that he consented. That is her story. And you have to understand that, that is the version you are getting from a woman who you know will lie to suit her own purposes. A woman who lied to the police multiple times during the course of their investigation giving the police ultimately five different stories as to what had really happened. That is her version. That is close to the truth as we're going to get. That doesn't mean it is the truth.

It doesn't mean that [the decedent], that's her version that he purchased the Heroin. That it was his money. This is the one who purchases Heroin every day. Like I said they say that's the evidence. That's the evidence from the mouth of the woman who will lie to suit her own purposes. A woman who will clean up evidence of what she just did, evidence

of her Heroin use and the needles that she injected into [the decedent] before she ever seeks help for him.

We detect within these remarks no improper suggestion by the prosecutor that defendant might be guilty of murder or that the jury should speculate regarding the events surrounding the decedent's death. Viewing the prosecutor's remarks in context, we find that the prosecutor simply and properly (1) emphasized the unlikelihood of defendant's assertions that the decedent consented to using heroin and had a history of heroin use by recounting the evidence tending to establish the decedent's distaste for drugs and defendant's drug habit, and drawing the reasonable inference therefrom that the decedent would not have consented to heroin use, *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); *Schutte, supra*, and (2) argued from the available facts, which included defendant's many, varied versions of events given to the police, that defendant was not worthy of belief. *People v Launsburry*, 217 Mich App 358, 361; 551 NW2d 460 (1996).

IV

Lastly, we reject defendant's contention that the cumulative effect of trial errors deprived her of a fair trial because we find that no errors occurred. *People v Daoust*, 228 Mich App 1, 16; 577 NW2d 179 (1998).

Affirmed.